## MAE RICHMOND *vs.* THE CITY OF NORWICH.

Second Judicial District, Norwich, April Term, 1921.
WHEELER, C. J., BEACH, GAGER, CURTIS and BURPEE, Js.

A municipality engaged in the performance of a public duty for the
public benefit, and not for its own corporate profit, will be immune
from liability for injuries occasioned therein.

The maintenance of a system of waterworks by a city, and the sale
of water to its inhabitants, is not, however, a governmental duty,
but an act done for the corporate benefit or profit in the manage-
ment of its own property; and where these facts clearly appear—as
in the present case—the issue of governmental duty does not arise.

The charter of Norwich (§ 79) prescribes that the waterworks of the
city "shall be forever maintained " by its board of water com-
missioners "under the direction of the court of common council";
while § 85 provides that the water board shall make by-laws or
regulations for the preservation, protection and management of
the waterworks, and that these shall be binding when approved,
by the court of common council. *Held* that in the discharge of
its duty of maintenance, the board of water commissioners had
the right to appoint a superintendent with power to hire an armed
guard for the protection of the reservoir, although so far as ap-
peared the common council had not approved of any rules or
regulations of the water board.

The exclusion of a question on cross-examination designed to show
that the witness took other photographs of the locus than those
he testified to, although erroneous, is harmless if the cross-examin-
ing party could have secured these photographs and laid them in
evidence if he had deemed them important.

Harmful error will not be predicated upon an irrelevant and unrespon-
sive answer respecting a trivial matter.

Having testified that she was able to earn practically nothing at her
business since her injury, the plaintiff was asked how she was
providing for herself, and replied that for the last two months she
had been living with relatives at their expense. *Held* that this was
admissible as tending to prove, as one element of damage, the
plaintiff's inability to pursue her former occupation.

It is the ordinary, every-day practice to lay in evidence the plaintiff's
hospital bill, after testimony of its amount has been received.

One D testified on his direct examination that he drove the automobile
in which the plaintiff was riding when shot. Upon cross-examin-
ation, for the purpose of showing that he did not use due care, he

Richmond *v.* Norwich.

was asked whether he knew that this country and Germany were at war in April, 1917, and of various steps taken in this State toward meeting the military emergency, including what other cities around Norwich had done in the way of armed guards at their reservoirs. *Held* that these inquiries were properly excluded, because not germane to the direct examination; the witness not having testified that he did not know the reservoir was guarded.

What other cities did in the way of guarding their reservoirs or public works during the world war raises collateral issues, and is not material, if the plaintiff admits—as in the present case—the right of the defendant city to place armed guards at its reservoir and does not question the notice given to those at the reservoir or those coming in contact with the guard.

Whether an expert is properly qualified or not to give an opinion, is to be determined by the trial court; and unless the ruling shows an abuse of discretion, it will not be disturbed by this court upon appeal.

Character may mean actual or reputed character or disposition. When used in the sense of one's nature or disposition, it may mean the sum of all the traits of character, or it may mean a single trait of character.

There are three possible methods of proving character in these different senses: first, by general reputation; second, by the opinion of those who have known the possessor of the trait in question; and third, by the acts or conduct, under somewhat similar circumstances, of him whose character is the subject of inquiry.

The first method is universally recognized.

The second method, although more often disapproved, is sound and wholesome, since all mental and moral characteristics are facts susceptible of proof, which can be furnished most effectively by those who have personal knowledge of them.

The third method is condemned, since proof of other specific instances would raise collateral issues, prolong trials, and be unfair to him who is compelled to explain his life on a moment's notice.

In the present case the plaintiff, for the purpose of showing that the guard was of quick temper, poor judgment, excitable and unfit for his job, called a witness who testified, against the defendant's objection, that, shortly after the shooting of the plaintiff, he drove to the reservoir and was stopped by the guard who, speaking brokenly, and appearing much excited, raised his gun and said he had "a good mind to blow your [the witness'] damned brains out.". *Held* that the admission of this character evidence, which came within the third method above stated, was erroneous and harmful to the defendant, especially as it was emphasized by the court in its charge; and that the evidence might also have been objected to upon the ground that the action was one of negligence, de-

pendent upon proof of the acts of the guard, not upon proof of his violent temper or other mental characteristics.

As tending to corroborate the testimony of the guard as to where he was when he fired the three shots, the defendant inquired of one of its witnesses as to finding certain empty shells at the reservoir shortly after the plaintiff was shot, of the same caliber as those used by the guard, and that the rifle used by the guard was a magazine rifle from which each used shell was ejected. *Held* that this evidence was improperly excluded.

The guard told a witness where he stood when he fired. *Held* that the statement to the witness was hearsay and inadmissible.

The evidence in the present case would have warranted the jury in finding that the plaintiff, aged forty-one, was in sound and vigorous health, and in consequence of her injuries became a helpless invalid for life. *Held* that under these circumstances this court was not prepared to say that a verdict for $25,000 was excessive, although certainly unusual.

Alleged improper conduct of counsel during the trial, and in statements made in argument, should be included in the appeal, not in a motion for a new trial, which is limited by statute (§§ 5840, 5850) to the grounds therein specified.

Facts, not testimony, should be incorporated in the finding; for this court cannot find the facts.

Objection to statements made in argument should be taken promptly; if not so taken, and the court of its own motion cautions counsel, the objection cannot subsequently be made after the return of an unsatisfactory verdict.

Argued April 26th—decided August 4th, 1921.

ACTION to recover damages for personal injuries inflicted by a reservoir guard of the defendant in shooting the plaintiff, brought to the Superior Court in New London County where a demurrer to the defendant's second defense was sustained (*Keeler J.*), and the cause was afterward tried to the jury before *Kellogg, J.;* verdict and judgment for the plaintiff for $25,000, and appeal by the defendant. *Error and new trial ordered.*

The city of Norwich maintained the Fairview Reservoir as a part of its water supply for the benefit of its inhabitants, and sold its water to them for a profit to it. The facts in relation to this are stated in de-

tail in *Hourigan* v. *Norwich,* 77 Conn. 358, 59 Atl. 487, and need not be here repeated.

The charter of the said city (7 Special Laws, pp. 172–204), approved July 5th, 1871, provides as follows:—

Section 79. "The waterworks constructed by the said board of water commissioners in behalf of said city . . . shall be and remain the property of said city, and shall be forever maintained by the said board of water commissioners, under the direction of the court of common council of said city, and in the manner provided by the by-laws or ordinances thereof. . ." Section 85 provides that in the distribution of the water the board shall act under the direction of the said court of common council, and shall, with its assent, establish scales of prices or terms upon which water shall be furnished, and shall make such by-laws or regulations for the preservation, protection and management of the said waterworks as may be deemed advisable, and upon approval of them by the common council they shall be of binding validity. Section 83 provides that the court of common council must approve of the election of a president of said board, and fix his salary, and that he shall perform any duties assigned to him by the common council. Other sections provide that claims on account of the waterworks must be approved by the common council which may appropriate money to pay them, and that "the hire of clerks and agents, and of extending pipes into new localities," shall be under the direction of the common council.

The jury might have found from the evidence offered by the plaintiff, that on May 15th, 1917, the board employed one Matri to act as guard of the reservoir in the night season; that Matri was without education, inferior in mentality, lacking in judgment, vicious in temperament, possessing little re-

gard for the life or safety of other human beings, and was not a proper person to act as a guard or caretaker, and was not a man qualified or fit to be armed with a dangerous weapon, and to act as a guard of the reservoir; all of which the board knew.

The superintendent who selected Matri armed him with a Winchester repeating rifle, and directed him to guard the reservoir and the land adjoining, and to scare intruders, and, if necessary, to "shoot, but shoot low, shoot in the legs." The board stationed the guard at the reservoir as a war emergency measure. The reservoir was a place of natural beauty, and a resort of persons in the hot weather, and was reached by a roadway leading from the public highway. The board erected across this roadway, for its entire width, a fence made of strong poles, from which was strung several strands of telephone wire.

A Mr. Dow, on July 30th, 1917, drove his automobile, containing his wife, and, as his guests, the plaintiff and her mother, to the reservoir by the Scotland highway to its junction with the Reservoir Road, where there stood a sign, "To the Reservoir," with index pointing to the Reservoir Road. He had proceeded along this road to a point about three hundred feet from the dam, when a large dog ran alongside the car and a man called out, but he could not distinguish the words. He had met with no obstructions in the roadway and saw no warning sign. He brought the car to a stop, and shortly began turning around, and, when he had partly turned, Matri, without warning, fired a shot into the back of the car, and it struck the plaintiff. When the car was fully turned, and was going away from the reservoir, Matri fired two more shots, neither of which hit the car or its occupants.

The defendant offered evidence to prove that the

fence was a substantial fence; that just after dusk Matri heard a crash at the fence, and upon investigation found the posts and wire partly knocked over. One of the guards went away to telephone to the superintendent. Matri remained, and shortly saw an automobile approach. It did not stop at the barrier, but continued on toward the dam. The guard shouted warnings to go back, and finally fired two warning shots, to scare away the intruders. The car proceeded on to the dam. The top of the car was up, and the guard could not see who was in the car. None of its occupants made any answer. When the car reached the point nearest the edge of the dam, the guard fired a third shot, which struck the plaintiff. The guard fired low, and did not intend to hit anyone in the car. His purpose was to scare them away.

Interrogatories as follows were submitted to the jury and answered: "1. Was the defendant negligent in selecting Joseph Matri to act as a guard of its reservoir property? Answer. Yes. 2. Was Joseph Matri in fact an improper and incapable person to perform the duties of armed guard of said reservoir property? Answer. Yes. 3. Was the defendant negligent in failing to maintain a sufficient fence or warning on the approach to the reservoir by way of the Reservoir Road, so called? Answer. Yes. 4. Was the plaintiff at the time of the accident a trespasser on the defendant's land? Answer. No. 5. Did Matri, in firing the shot which wounded the plaintiff, act as a reasonably prudent man would act under the circumstances then existing? Answer. No."

*Allyn L. Brown* and *Edwin W. Higgins,* for the appellant (defendant).

*John H. Cassidy* and *Lawrence L. Lewis,* for the appellee (plaintiff).

WHEELER, C. J. Error is assigned in the failure of the court to submit to the jury the issue of whether the defendant city was engaged in the performance of a governmental duty at the time Matri, the guard at the reservoir, shot the plaintiff.

If it be assumed that the defendant is right in its position that either the second defense was improperly eliminated from the case by demurrer, or, if not, that the issue of governmental duty did not need to be affirmatively alleged, or that sufficient evidence upon this subject was introduced to make it necessary to submit this question to the jury in accordance with defendant's requests,—we do not think that the trial court committed harmful error in failing to make such submission. When a municipality is engaged in the performance of a public duty for the public benefit, and not for its own corporate profit, it will be immune from liability for injuries done in the performance of such acts. The defendant city was not engaged upon such a duty at the time the plaintiff suffered her injuries. In collecting, distributing and vending water, it was engaged in the performance of acts done in the management of its property or rights for its own corporate benefit or profit and that of its inhabitants, and for injuries caused by it through its negligent acts it cannot plead governmental immunity. So that, upon the conceded facts in this case, the question of governmental immunity did not arise in the case, and we have no occasion to consider the ruling upon the demurrer or the other claims made by the defendant upon this issue. The case of *Hourigan* v. *Norwich*, 77 Conn. 358, 364, 365, 59 Atl. 487, is conclusive upon this question. Ground four of the demurrer to the complaint in that case raises the precise point, and was overruled, and that ruling upheld, and this accords with the best considered authority.

Complaint is made by the appellant of the charge: "and the board of Water Commissioners had the power to employ the superintendent with the powers hereinbefore set forth." The claim of the defendant is that the acts of Matri were not the acts of an authorized agent of the city, since the act of Burnap, in employing Matri as a guard, was unauthorized by the board of water commissioners; and that the board did not have the power to preserve, protect and manage the water supply by the employment of a guard, without the approval of the court of common council. The superintendent's duties were particularized in the evidence, by having the finding as to them in *Hourigan* v. *Norwich,* 77 Conn. 358, 59 Atl. 487, incorporated. This specifies that the superintendent has authority to hire and discharge all labor. Whether the board of water commissioners had authority to authorize the superintendent to employ Matri for the purpose of guarding the reservoir, depends upon whether the charter gives to it this power, and it is, of course, essential that the mode of exercise of the power prescribed be followed. The defendant relies upon the provision, in § 85 of the charter, that the board shall make by-laws or regulations for the preservation, protection and management of the waterworks, and that these shall be binding when approved of by the court of common council. So far as the record discloses, the council have never approved of any such by-laws or regulations. The logic of the defendant's claim would compel the position that the board had no authority to maintain the waterworks, and to provide help in its care and maintenance, except with the approval of the council. But the reading of all of the provisions of the charter shows that the legislature did not contemplate so impracticable a management and operation of the waterworks as this course would

involve. Section 79 provides that they "shall be forever maintained by the said board of water commissioners, under the direction of the court of common council of said city, and in the manner provided by the by-laws or ordinances thereof, for, and on behalf of, said city. . . ." The council may direct, but the duty of maintenance is upon the board. In the absence of by-laws or regulations approved of by the council, the board must fulfil its duty of maintenance, for the public service cannot be jeopardized by the failure of the council to approve, or of the board to make, by-laws

In *Hourigan* v. *Norwich*, 77 Conn. 358 59, Atl. 487, for the purpose of increasing the water supply, the board of water commissioners were engaged in taking down a bank, when a laborer so employed was injured by the falling bank. In a suit by him to recover damages from the city, we said, on page 363: "The acts charged were done by the defendant city, and none the less so that they were done through the board of water commissioners. The action complained of was the action of the city, and the city was properly made defendant."

A number of rulings on evidence were excepted to.

1. The plaintiff's witness Pitcher, testified as to having taken several photographs of the *locus*. On cross-examination he was asked whether he had taken other photographs showing a fence extending across the road, and also photographs of other permanent objects in the roadway. This appears to have been legitimate cross-examination, but its exclusion did not materially harm the defendant. It could have secured these photographs and laid them in evidence if it had deemed them of importance in the case.

2. The same witness was on redirect examination asked to describe the reservoir as to its surroundings

and attractiveness to the people. He replied that he and others frequently visited the reservoir to see it and take in the scenery. Defendant objected to the evidence, and asked to have its exception noted. The court declined to permit the exception to be noted, because no objection had been noted. The trial court was in error in its understanding of the record. The answer was irrelevant and irresponsive, and should have been stricken out. But the subject-matter is too inconsequential to predicate harmful error upon.

3. The plaintiff's direct examination proceeded as follows: "Q. You are not able to earn anything at your business? A. Practically nothing. Q. How are you providing for yourself? A. I have been staying with my cousin the last two months—relatives. Q. Not paying anything, are you? A. No." The second question was objected to as an element of damage, and exception taken to the ruling admitting it. These questions were corroborative of the first question upon this subject, and were admissible as tending to prove, as an element of damage, the inability of the plaintiff to pursue her former occupation.

4. The plaintiff testified upon her direct examination as to the amount of the hospital bill, and the bill was then laid in evidence against the objection and exception of the defendant. The course taken was the ordinary, every-day practice. No reasonable objection could be made to the admission of the bill.

5. Dow testified on his direct examination for the plaintiff, that he was the driver of the automobile in which the plaintiff was riding when shot. Upon cross-examination, for the purpose of showing that he did not use due care, he was inquired of as to whether he knew that the United States entered into war with Germany in April, 1917, and of various steps taken in Connecticut toward meeting the military emergency.

He was also inquired of as to whether he knew that other cities around Norwich were guarding their water supply with armed guards at that time. All of these inquiries were excluded because not cross-examination. The ruling was right. If the witness had testified as to his not knowing the reservoir was guarded, he might have been cross-examined as to whether other cities in proximity to Norwich were guarding their water supply; but the record does not present that situation.

6. The defendant inquired of its witness Burnap, on his direct examination, as to what others were doing to guard their public and *quasi*-public works during the year 1917, in order to show the war-emergency conditions, as bearing upon the due care to be exercised by Matri, the guard, and the defendant city, as well as the driver of the automobile in which plaintiff was. This line of inquiry was properly excluded as immaterial and as raising collateral issues, inasmuch as the plaintiff conceded the right of the defendant city to put armed guards at the reservoir, and never questioned the selection of a guard and his equipment, and the notice given to those at the reservoir or those coming in contact with the guard.

7. The offer to prove by the expert Hagberg as to the difference in report between shots in the air and those taking effect, was excluded because of failure to sufficiently qualify the witness. Whether an expert is properly qualified or not to give an opinion is to be decided by the trial court, and unless the ruling shows an abuse of discretion, it will not be disturbed by the appellate court. *Barber* v. *Manchester,* 72 Conn. 675, 684, 45 Atl. 1014; *Barber* v. *International Co.,* 73 Conn. 587, 48 Atl. 758; *Hygeia Distilled Water Co.* v. *Hygeia Ice Co.,* 70 Conn. 516, 532, 40 Atl. 534. The record does not show in this instance an abuse of discretion.

8. The ruling admitting the opinion of Funk, over

defendant's objection that he had not been duly quali-
fied, was correct.

9. For the purpose of showing the mental character-
istics and disposition of Matri, the guard—that he was
of quick temper, of poor judgment, excitable, and
unfit to act as a guard—the plaintiff, against the ob-
jections of the defendant, introduced the evidence of
McNamara, that shortly after the shooting of the plain-
tiff he drove to the reservoir and was stopped by Matri,
who asked him what he was doing there, and on being
told by McNamara he was just out for a drive, Matri,
speaking brokenly, and appearing much excited, raised
his gun and said, "I am a good mind to blow your
damned brains out." This evidence was a species
of character evidence. CHIEF JUSTICE TORRANCE
pointed out in his article on Character Evidence, in
12 Yale Law Journal, p. 352, that "in our law . . .
character has no single, well defined, technical mean-
ing." Character, he says, may mean actual character
or disposition, or reputed character; and actual char-
acter, when used in the sense of nature or disposition,
may mean the entire character—the sum of all the
traits—or it may mean a single trait of character. The
mental characteristics of Matri, which the plaintiff
was attempting to prove by this offer, were of the latter
class—the single trait of character. Character in
all these different senses, and hence the single trait
of character, might be proved in three possible ways:
(1) The estimate in which the individual is held in
the community; that is, his general reputation as to
the trait in question. (2) The opinion as to this trait
of those who have known the individual and had the
opportunity to know whether he possessed this trait
or not. (3) The acts of the individual under some-
what similar circumstances, from which his character
as to this trait may be inferred.

The evidence of general repute affords the basis for an inference as to the actual character, whether it be the entire character or a single trait of character. Method one is generally recognized as an established method of proving character. Method two is permitted in some jurisdictions, but in most it is denied. Whether or not one was of quick temper will require proof of a mental characteristic, and this is the proof of a fact. No one knows so well about this fact as he who has known the person and had the opportunity to determine it. How much more convincing is such evidence than that of a witness who testifies to the general repute of this person as to this mental characteristic. His testimony is based upon hearsay, and quite likely rumor and gossip. If mental characteristic is a fact, there is no valid reason why this fact may not be proved by any witness who knows what it is. Personal observation and personal knowledge are a more trustworthy reliance than general reputation. An article from the Law Times, quoted in 12 Central Law Journal, 414, 416, expresses, we believe, the common judgment upon this matter: "Surely, in the common sense conduct of affairs, there would not be a moment's hesitation whether, in investigating the character of a man, to place more dependence on a deliberate opinion formed as the result of personal contact and experience, or on a recollection of the random utterances of an indefinite number of persons who may never have seen the object of their garrulity, nor have had the remotest opportunity of forming a judgment upon his merits." In his article on "The Artificiality of Evidence," 21 Yale Law Journal, 105, 112, CHIEF JUSTICE BALDWIN speaks of the advanced ground which this court has taken in recent years in broadening our law of evidence that it may let in the truth. An example of this is found in *Vivian's Appeal*,

74 Conn. 257, 50 Atl. 797, where we said: "A feeling is a fact; and an ultimate fact. If one says that he loves another, he expresses a sentiment existing at the time when he speaks. A judgment is the result of a mental process acting upon prior events. A man may be mistaken in his judgments of others, or of others' acts,—as to what his feelings are towards others he cannot be." In *Spencer's Appeal,* 77 Conn. 638, 643, 60 Atl. 289, we developed this idea: "Affection may be expressed by acts or words. When expressed by words, the force of the expression may depend less upon the words used than upon the connection in which they were used or the manner in which they were uttered. . . . The precise words which were employed have generally faded from the memory. The impression which they gave may remain, and it is the impression justly to be derived from them which is material. If the facts and conditions giving rise to the impression were either so numerous or so evanescent in character that it seems unlikely that they can be fully set before a jury, it is fully within the discretionary powers of a trial judge to allow a witness to state his impression; leaving it to the cross-examination to elicit the particular grounds for it, should it afterwards be thought worth while to make such an inquiry." Again, in *Sallies* v. *Johnson,* 85 Conn. 77, 81, 81 Atl. 974, we said: "A man's love or hatred of another is a fact expressive of his feeling towards such person." The whole range of mental and moral characteristics must necessarily be held, in accordance with these authorities, to be facts, and as such to be proven by whoever knows of their existence. We ought not to allow direct proof of mental and moral characteristics in all classes of cases except those where character is in issue, and as to these prove them exclusively by general reputation.

We think the decisions to which we have referred, and others to which we need not refer, require the admission of evidence of character from those who know. Modern works on evidence of highest repute deplore the fact that character evidence by this method of proof is so generally excluded, and regard it as one of the anomalies of the law of evidence. 3 Wigmore on Evidence, § 1986; 3 Chamberlayne on Evidence, §§ 1901, 1936. In *Mathewson* v. *Mathewson*, 81 Vt. 173, 185, 69 Atl. 646, direct evidence from a qualified witness was received that the libellant had a "very wilful, unpleasant and domineering disposition." The court held that when a witness has had personal observation, and the facts that lead the mind to a conclusion are incapable of being so detailed as to enable another to comprehend them, he may add his opinion or the conclusion induced by such observation, and therefore the witness was allowed to add the inference that he had this disposition. In *State* v. *Lee*, 22 Minn. 407, 410, the court held: "But evidence of the disposition of a person, by one who knows such disposition from personal observation, is not evidence of opinion in any objectionable sense. It is evidence of fact—just as much evidence of a fact as is evidence of the disposition of a horse." In *Sydleman* v. *Beckwith*, 43 Conn. 9, the question admitted was: "From your knowledge of the horse was he in your opinion a safe, kind horse?" JUDGE LOOMIS cites, among a long list of authorities, admitting similar inquiries, "that a horse had a sulky disposition." *Whittier* v. *Franklin*, 46 N. H. 23. That direct evidence of the disposition of an animal may be shown, is universally held. We perceive no reason why direct evidence of the disposition of a person should not be as readily admitted as that of an animal; and the court saw no reason for this distinction, for JUDGE

LOOMIS, on page 13, says: "Where the disposition of a person or of an animal (as in this case) is to be ascertained, the facts to be proved, being latent, can be ascertained only by symptoms and outward manifestations. If these happen to be very striking they may remain in the memory and can be stated, but in many cases they are very slight in each particular instance, and only the impression of an indefinite number of such appearances remains, resulting in an opinion that the quality or disposition in question exists."

The third suggested method of proving character was that adopted in this case. By all authority, character—whether the entire character or disposition, or a single trait of character—cannot, except in certain defined cases, be proven by specific instances, or by the inference to be drawn from them. The reasons assigned for the rule are that the introduction of specific instances would raise collateral issues and unduly prolong the trial, and be unfair, since no one could without notice be prepared to explain any act in his entire life. We have ruled upon this very matter several times, and we have no occasion to add to the discussion then had. *Betts* v. *Lockwood*, 8 Conn. 487, 488, 489; *State* v. *Ferguson*, 71 Conn. 227, 230, 232, 41 Atl. 769; *Verdi* v. *Donahue*, 91 Conn. 448, 454, 99 Atl. 1041; *Stow* v. *Converse*, 3 Conn. 325, 345; *Swift's* Evidence, 143; McKelvey on Evidence (2d Ed.) § 123; 22 Corpus Juris, 481; *Colburn* v. *Marble*, 196 Mass. 376, 380, 82 N. E. 28; *Miller* v. *Curtis*, 158 Mass. 127, 131, 32 N. E. 1039. The ruling admitting this evidence was erroneous. It cannot be held to have been harmless; on the contrary, this evidence was quite liable to have had a potent influence in the making of the verdict, as the court in its charge referred to the testimony of McNamara with emphatic detail.

The answers to interrogatories one and two show very clearly that this evidence had a material effect upon the answers made.

Another objection which might have been taken to this evidence was that the action was one of negligence, to be resolved by the acts done by Matri, and not by proof of his violent temper or other mental characteristics. So far as the present record discloses, we think its exclusion, if objected to upon that ground, would have been proper. *Carlson* v. *Connecticut Co.*, 95 Conn. 724, 112 Atl. 646.

10. Matri testified as to firing two shots from his rifle in the air, and a third shot aimed low at the automobile, and as to where he was when he fired these shots. For the purpose of corroborating Matri's statement, defendant inquired of its witness Burnap as to finding certain empty shells at the reservoir shortly after plaintiff was shot. It appeared in evidence that the shells found were of the same calibre as those used in the rifle by Matri that night, and that the rifle was a magazine rifle from which each used shell was ejected. This evidence was excluded. It ought to have been admitted, as it did tend to corroborate Matri's statement. *Commonwealth* v. *Watson*, 109 Mass. 354, 355.

Burnap testified as to where Matri said he was when he fired these two shots. Matri's statement was objected to and excluded. The ruling was correct. Matri's statement, made through Burnap, was hearsay.

11. Other exceptions to rulings made in reference to evidence offered to prove that the duty the city was performing was a governmental one, become of no importance in view of our holding that this question did not arise in the case.

The defendant moves to set aside the verdict because the damages awarded are excessive. The jury

might have found that the plaintiff was vigorous and in sound health, and in consequence of the injuries she suffered became a helpless invalid for life; that her left limb was amputated just below the left thigh in order to save her life; that she suffered greatly from gunshot gangrene and erysipelas; that she has suffered much pain constantly since the injury, and will always suffer pain, and can expect little physical improvement; that her nerves have been shattered, and she has never recovered fron the shock of the injury, and has lost her sense of smell; that she is and will be unable to have the use of her limb, even with the aid of artificial means; that she was forty-one years of age when injured, having an expectation of life of twenty-seven and one half years; that she was earning $40 per week at her occupation, and that she will never hereafter be able to work at her employment; and that she has been under the constant care of physicians since her injury and has expended in the treatment of the injury $1,600.

The damages awarded are unusually large for this jurisdiction, but if the jury found these facts proven— and they reasonably might have done so—we cannot hold the damages awarded to be excessive.

The subject-matter of the motion for a new trial— the improper conduct of counsel during the trial and the improper statements in the argument—should have been included in the appeal. The remedy by way of a new trial is limited to the specified statutory grounds. General Statutes, §§ 5840, 5850. The court incorporated a part of the subject-matter of the motion in its finding.

As to paragraphs seventeen and eighteen of the defendant's proposed finding, which corresponded to paragraphs nine and ten of the motion for a new trial, it made a specific finding. As to the other paragraphs

of the motion for a new trial, made a part of defendant's proposed finding, it made no finding, but incorporated in its finding the testimony taken on the hearing on the motion for a new trial relating to these paragraphs. The Superior Court should have found the facts as to this matter. This court cannot find the facts.

Counsel for defendant moved to correct the finding, and filed exceptions as to paragraphs seventeen, eighteen and nineteen of defendant's proposed findings. This motion the court denied. As to the statements made by Mr. Lewis, and that made by Mr. Cassidy in reference to Mr. Brown, as found in said paragraphs seventeen and eighteen, which we think it unnecessary to quote, the court has found that no objection or exception was taken by the defendant to the same prior to its motion for a new trial. Of its own motion the court interrupted Mr. Cassidy's argument and cautioned him, and thereupon he proceeded to another subject. The objections to these statements come too late. This situation does not present such an abuse of an attorney's privilege as to justify our disregarding our general rule: "A party who has full knowledge of improper conduct by his adversary's attorney . . . cannot remain silent and speculate on the chances of a favorable verdict, and afterward be heard to complain when the verdict is unsatisfactory." *McKiernan* v. *Lehmaier*, 85 Conn. 111, 118, 81 Atl. 969; *James* v. *Bowen*, 83 Conn. 702, 707, 78 Atl. 420; *State* v. *Laudano*, 74 Conn. 645, 51 Atl. 860; *State* v. *Tuller*, 34 Conn. 280, 294.

As to the rest of the motion to correct, it was properly denied, and the exceptions concerning the same are not well taken.

There is no merit in the motion in arrest.

There is error on the appeal and a new trial is ordered.

In this opinion BEACH, GAGER and CURTIS, Js., concurred.

BURPEE, J. (dissenting). The plaintiff alleged that Matri, the guard who fired the shot which wounded the plaintiff, "was not a man qualified or fit to be armed with a dangerous weapon and to act as guard at the reservoir." This allegation the defendant denied. Upon this issue the defendant produced testimony by Matri that he had had some training in the use of firearms and knew how to handle them properly. Thereafter the plaintiff offered the testimony of McNamara for the purpose of showing, as stated in the opinion of the majority of this court, that Matri was "unfit to act as a guard"; or, as stated by counsel who presented the testimony, to show "his qualification as a guard."

I think this testimony was admissible for such purposes. Whatever bearing it might or might not have upon the general character of Matri, or upon any single trait of his character, it seems to me it had a direct and very forcible bearing upon the important matter in question. It tended to show that he had not had the training he claimed to have had, or that in spite of any training he had had, Matri did not then know how to handle a dangerous weapon properly, and that lack of training and knowledge made him unfit or unqualified for the duty the defendant had employed him to perform. In the opinion of the majority, McNamara's testimony is said to be "a species of character evidence." It seems to me that it should not be restricted as character evidence. Matri's mental qualifications, disposition, temper, and judgment may have been unquestionable, and yet, if he did not know and practice the proper use of firearms, he was unfit and unqualified to act as guard armed with a loaded rifle.

His fitness and qualifications of that kind were in dispute, and it is conceded that McNamara's testimony was introduced for the purpose of showing that Matri was unfit and unqualified in that respect. Matri's conduct would indicate convincingly whether he had the training, knowledge and practice to fit him "to act as a guard" armed as he was by the defendant. That conduct, of course, must be judged in view of the circumstances. The record discloses that McNamara was inoffensive and had given no cause for suspicion. He had promptly obeyed Matri's order to stop his automobile, had answered Matri's questions civilly and reasonably, and was trying to turn his car to go away from the reservoir. Then Matri advanced closer, raised his loaded gun to his shoulder, and pointed it at McNamara, with the muzzle within four or five feet of his face, and, holding the weapon in that position some minutes, declared that he had a mind to blow out the brains of this unarmed and peaceable citizen. It seems to me that was the conduct of a man who was "unfit to act as a guard " anywhere, at any time, and that, no matter what Matri's character or disposition was, it demonstrated that he was not qualified by training and knowledge to handle a dangerous weapon properly.

The exclusion of the testimony of the witness Burnap, as to finding some empty cartridge shells on the reservoir shortly after the plaintiff was wounded, appears to me to have been justifiable and harmless. In the first place, I think the record shows that Matri had not testified definitely where he was when he fired each of the shots. He had said that he fired three shots while he was walking from near the center of the dam toward the approaching automobile; one, when it was one hundred and fifty feet from the dam, one when it was fifty feet from the dam, and the third when it was

on the dam. He thus fixed the locality of the automobile, but not precisely where he was, when he fired any of the three shots. This testimony was brought in by the plaintiff in Matri's direct examination, was repeated and confirmed in his cross-examination at the suggestion of the defendant, and was undisputed. In such a state of this testimony, it hardly seems that any corroboration by the defendant was necessary or profitable. But corroboration was the only purpose for which it was claimed.

But I think it was quite immaterial where Matri stood when he fired any of the shots, which all the witnesses agreed that he fired. The plaintiff and two other witnesses testified that the first shot was the one that took effect, and that the others were fired while the automobile was going away from the dam. On the other hand, Matri claimed that the first two shots were warning shots, fired in the air, and only the third shot was aimed toward the automobile. The plaintiff's testimony was intended to show that Matri was reckless or negligent; Matri's testimony was calculated to prove that he was cautious and reasonable. In considering these conflicting claims, it does not appear that the jury could get any help from knowing exactly where Matri was when he fired any shot. It was admitted that he was on the dam when he saw the automobile approaching from about one hundred and fifty feet from the dam, and that while walking toward the approaching automobile, he fired all three shots within that short range. What the jury should have been concerned in deciding was which of these shots was the aimed shot; that is, whether in fact Matri fired first two warning shots. His precise location within the limits and circumstances he had explained were entirely insignificant. Moreover, the record shows that the rifle Matri was carrying was one from

which each used shell was ejected by pulling down a lever; but the record does not contain any evidence tending to show that Matri extracted each shell on the spot where he fired each shot, or that he did not walk some distance from that spot before he threw out the empty shell and reloaded his gun. It seems to me that the material matter in question was not exactly or approximately where Matri stood when he fired any of the three shots, but which one of the shots he aimed toward the automobile; and that to this matter the offered testimony was irrelevant and immaterial and its exclusion harmless. And it seems the more so because Matri's statements concerning his locality were admitted to be true, and any attempt to corroborate them, even if it were practicable and desirable to do so, would be superfluous.

I do not disagree with any statement of law contained in the opinion of the majority of this court, but I am constrained to dissent from its application to the conditions of this case. I do not think the rulings of the trial court which are found erroneous fall within the limits of the law defined in their opinion. For the reasons I have already stated, those rulings appear to me to be justifiable or harmless, and therefore to give no cause for a new trial.