[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
Memorandum of Decision
Facts
The court finds the following facts to be true.
In September, 1985, Pamela Jo Mauldin (then Pamela Jo McGrath) began working as a dental assistant at the orthodontic offices of Drs. Alan Maris and Kenneth Carlough. Eventually, she began CT Page 12573 dating Dr. Maris. In the spring of 1989, she underwent a hysterectomy; Dr. Maris decided to date others.
In the summer of 1989, after Ms. McGrath had recovered from the operation, Dr. Maris sought to resume the relationship, telling Ms. Mauldin that they would live together, travel together and spend the rest of their lives together. By the end of the summer, they were living two weeks each month at Ms. Mauldin's home and two weeks at Dr. Maris's home.
Their financial arrangements were as follows. On September 9, 1989, Ms. Mauldin signed the documents necessary to transform her individual account at the New England Telephone Company Employees' Federal Credit Union into a joint account with Dr. Maris. Dr. Maris made a number of deposits into that account. From the account, Ms. Mauldin would write checks to cover both her own and their joint expenses. After the relationship had terminated, Dr. Maris began to claim that all his moneys deposited into their joint account were loans to Ms. Mauldin.
Of the twenty-three checks deposited,[1] nineteen are made payable to the credit union; four are made payable to Ms. McGrath. On the back of the check made payable to the credit union, no writing appears except for a single endorsement in Dr. Maris's writing on one of the checks. (Exhibit 17.)
On some of the checks, Dr. Maris made notations in the memorandum section of the check. Most of these are totals for his own use. The most significant of Dr. Maris's notations is on Exhibit 11, a check dated July 27, 1990, on which Dr. Maris wrote the word "loan" in the memorandum section. The check was not deposited until five days after it was dated; Ms. Mauldin denies having seen the word "loan" on the check when she signed it. The court finds that Dr. Maris wrote the word into the memorandum section after Ms. Mauldin had signed the check but before Dr. Maris had deposited it.
The two lived in this fashion for approximately a year. Then, in the summer of 1990, Ms. Mauldin's relationship with Dr. Maris was causing a problem at work; Dr. Carlough was uncomfortable at supervising a woman who was the equivalent of the wife of his partner. There was, of course, never any question of Dr. Maris's leaving the partnership, and so Ms. McGrath was required to leave a job she enjoyed. CT Page 12574
She and Dr. Maris talked about her future. Dr. Maris did not approve of her taking a similar job in another office because she then would not be available to accompany him on his frequent trips and vacations. They decided that she should go to hairdressing school. Dr. Maris offered to set her up in a business: he would own a travel agency; she would have a barbershop next door; it would be called "Hair Today, Gone Tomorrow." He discussed the project with his accountant. He promised her that if she would leave her employment in his orthodontic practice, she need not be concerned: he would take care of her material wants and needs for the remainder of her life.
The Court finds that in reliance upon Dr. Maris's promises, she left her employment in the dental office and attended hairdressing school beginning in September, 1991. Her education was interrupted by a serious illness in February, 1991, but following her graduation she began working as a hairdresser. By renting out space in an established shop, she could take time off as required by Dr. Maris' travel schedule.
By the summer of 1992, the relationship was ending. Dr. Maris's letter of August 17, 1992 (Defendant's Exhibit 21) suggests that the reason is Ms. Mauldin's view that their arrangement should lead to marriage and his refusal to make such a commitment. Ms. Mauldin has testified that the reason for the breakup was Dr. Maris's decision to spend six months each year at his villa in Mexico, expecting to return to a waiting Ms. Mauldin for an annual six months in Connecticut. In any case, Dr. Maris's last check was deposited into their joint accounts in April of 1992; Ms. Mauldin transformed the account into a personal account in September returning to Dr. Maris the $3,500 that was in their account that belonged to him.
In his August 17 letter (Exhibit 21), Dr. Maris made a number of arrangements concerning the couple's practical affairs, some of them trivial. Among these arrangements, there is no mention of any loan that Dr. Maris claimed to have made to Ms. Mauldin.
Discussion
Much of the case hinges on credibility. Dr. Maris asserts that Ms. Mauldin made an oral promise to repay the moneys which Dr. Maris was depositing into their joint account and amounts which he expended on her house and that she promised that she CT Page 12575 would execute a document providing that those moneys would be paid back from the proceeds of the sale of her home whenever she should sell it. Ms. Mauldin denies that Dr. Maris's deposits into their joint account and the amounts that he expended on her house were loans.
The defendant has offered testimony from four people who, other than his daughter, know Dr. Maris best: the orthodontist with whom Dr. Maris began his practice (Dr. Peter Demas), his partner during most of his career (Dr. Kenneth Carlough), his former best friend Dr. Barry Stark and the woman with whom he had a long-term romantic relationship (Ms. Mauldin). Each has testified that Dr. Maris's character for veracity is miserable; some have testified that his reputation for veracity in the community of orthodontists is miserable. Other than his daughter, these four have been more closely involved with Dr. Maris than anyone. The court finds that their shared view that Dr. Maris cannot be trusted is compelling evidence indeed. The plaintiff himself has offered no evidence to contradict this character evidence.
The plaintiff seeks to blunt the force of this compelling testimony by pointing out that each of the witnesses has been involved in financial disputes with him, some of which have resulted in lengthy and protracted litigation. That is, the plaintiff claims that these witnesses described him as untrustworthy as a result of a bias against him. These people have spent years suffering from Dr. Maris's duplicity; they do not trust him; their ill feeling toward Dr. Maris is not based on bias, but rather on the very fact about which they testified: they bear ill will toward Dr. Maris because he cannot be trusted.
The personal opinion of the veracity of a witness by those who know him well and a witness's reputation in the community for veracity, are admissible and relevant. State v. Gelinas,160 Conn. 366, 368, 279 A.2d 552, 554 (1971); State v. Blake,157 Conn. 99, 104-105, 249 A.2d 232, 234-35 (1968): Richmond v.Norwich, 96 Conn. 582, 594, 115 A.2d 11, 16-17 (1921). Given their closeness to Dr. Maris, the unanimity of their opinion, and the lack of contradictory evidence, the opinions of these character witnesses is given great weight by the court.
Dr. Maris's testimony was directly contradicted on a number of points, sometimes by his very own words. He testified that other than the initial cash deposit into the credit union CT Page 12576 account, he never made deposits into the account. This is an important point because Ms. Mauldin testified that she never saw the word "loan" written on one of the checks which was deposited into the joint account, and there was a five day period between the date on the check itself and the date it was actually deposited.
Prior inconsistent statements are, admissible in order to impeach a witness. Schurgast v. Schumann, 156 Conn. 471, 482,242 A.2d 695, 701 (1968); Branford Trust Co. v. PrudentialInsurance Co., 102 Conn. 481, 485, 129 A.2d 379, 381 (1925). Dr. Maris's denials concerning the question of who made the deposits into this joint account is clearly contradicted by his own writing at the time he had been making the deposit.
Dr. Maris denied that he had discouraged Ms. Mauldin from working in another dental office and claimed never to have even engaged in discussions about the topic. Ms. Mauldin had to leave employment in Dr. Maris's office because their personal relationship was harming the work environment. Dr. Stark has testified that he and Dr. Maris had explicit discussions about the topic. He testified that he was willing to offer Ms. Mauldin a job in his office, but that she could not work there if Dr. Maris expected her to accompany him on his frequent travels, and that Dr. Maris agreed that she would frequently be absent when she accompanied him on his trips.
His accountant, James Mason, testified that Dr. Maris was a compulsively meticulous record keeper and would never have entered into a loan agreement without producing careful documentation. Dr. Maris produced no documentation whatsoever, other than the word "loan" in the memorandum section of one check which he might well have added after the check had been endorsed. Given Dr. Maris's practice of keeping careful documentation, the court finds that Dr. Maris was being untruthful when he testified that he and Ms. Mauldin agreed that the amounts of money that he was depositing into their joint checking account were loans and that they simply never got around to producing any written loan document.
None of Dr. Maris's explanations for the joint account is persuasive to the court. It is more probable that it was an account such as husbands and wives and men and women who are living together keep: each makes contributions to the living expenses of both, no one keeps a very close track of who is CT Page 12577 depositing and who is spending what. If Ms. Mauldin were to die, then the doctor would have been perfectly justified in retrieving his own money that he had deposited into his joint account with Ms. Mauldin that had not yet been spent on their joint expenses.
Count one of the complaint alleges breach of contract. The court finds the breach claimed is based upon an alleged oral agreement that the money put into the account was a loan to be paid back upon the sale of defendant's house. Since she still lives there and has not sold the house, there is as yet no breach of the alleged contract. However, the court finds that there was no oral agreement since it does not believe the testimony of the plaintiff that there ever was a contract. Judgment will enter for the defendant on count one.
In count two, the plaintiff claims unjust enrichment. The court finds the arrangement was for the mutual benefit of the parties and that the defendant was not unjustly enriched. She provided him with the love and affection he wanted and he provided the money. Judgment enters on count two for the defendant.
Regarding the third count which is a claim for return of various items of personal property, the court finds that the plaintiff failed to meet his burden of proof as to who owned them and, therefore, enters judgment for the defendant on this count.
As to the fourth count, a claim for a constructive trust on the defendant's house, the court does not find the testimony of the plaintiff to be credible. It does believe the testimony of the defendant and, therefore, enters judgment for the defendant on the fourth count.
In view of the fact that the plaintiff has failed to prove his case, it is not necessary for the court to consider the special defense of the statute of frauds filed by the defendant under C.G.S. § 52-550 (a)(4)(5) and (6). However, by way of dicta, the court notes that the statute provides that no civil action may be brought in certain cases, such as this one, unless the agreement is made in writing and signed by the party to be charged. First, the statute requires a written agreement before any action may be brought upon an agreement for the sale of . . . any interest in or concerning real property." Connecticut General Statutes § 52-550 (a)(4). In this case the plaintiff claims that the alleged loans were to be repaid upon the sale of CT Page 12578 the defendant's house. The court finds that the statute bars this claim.
The statute also requires a writing before any action may be brought "upon any agreement that is not to be performed within one year of the making thereof." The court finds that the alleged agreement was clearly not to be performed within a year. It is, therefore, bared by the statute of funds.
Thirdly, the statute requires a writing "upon any agreement for a loan in an amount which exceeds fifty thousand dollars." In this case the plaintiff, in his first amended complaint, alleged a debt of $55,700. He later, in his second amended complaint, claimed only $48,864. The court finds that the reduction was made after the special defense statute of frauds was filed which alerted the plaintiff to the defense if he claimed over $50,000. The court, therefore, finds that the plaintiff did so to avoid this defense. The court cannot accept this type of manipulation to avoid the effect of the statute of frauds.
The defendant has filed a counterclaim alleging that the plaintiff promised to take care of her for the rest of her life, if she left her dental assistant's job and took a job that would allow her to travel with him. She claims he breached the agreement by moving to Mexico for six months every year. She could not accompany him because of her children. The court finds that the plaintiff did break his promise to her, however, the court finds that she did not establish an amount of damages that she suffered. Therefore, the court finds for the defendant on count one of the counterclaim.
Regarding counts two and three for trespass and theft, the court finds no evidence to support either count and, therefore, finds for the plaintiff on the second and third counts of the counterclaim. The court also finds no evidence to support counts four, five and six and, therefore, finds for the plaintiff on those counts also.
The court, therefore, will enter judgment for the defendant on the plaintiff's complaint and judgment for the plaintiff on the counterclaim.
However, the defendant has also claimed attorney's fees which the court finds should be awarded to the defendant for defending a case which the court finds to be totally without merit. CT Page 12579 Accordingly, the court will entertain a motion to determine the amount of attorney's fees to be awarded to the defendant.
Hurley, J.