IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs February 24, 2004

## STATE OF TENNESSEE v. CHRISTOPHER KEVAN HEIN

**Direct Appeal from the Criminal Court for Knox County**
**No. 68318     Richard R. Baumgartner, Judge**

---

**No. E2003-01793-CCA-R3-CD**
**June 9, 2004**

---

The defendant, Christopher Kevan Hein, was charged with the first degree murder of his girlfriend and convicted by a Knox County Criminal Court jury of the lesser-included offense of criminally negligent homicide, a Class E felony. He was sentenced by the trial court as a Range I, standard offender to two years in the Department of Correction, which had already been served by the conclusion of the trial. In this timely filed appeal as of right, he raises the following five issues: (1) whether the trial court erred in precluding the defense from introducing taped statements that an unavailable witness, Thomas Hendrix, made to an undercover informant and to a Tennessee Bureau of Investigation ("TBI") agent in which he described his participation in the burning of the victim's body and stated that the murder was committed by George Cate; (2) whether the trial court erred in precluding the defense from introducing Cate's statements to law enforcement officers; (3) whether the trial court erred in allowing an officer who was not qualified as an expert witness to express his opinion regarding the tendency of suspects during interrogation to minimize their involvement in crimes; (4) whether the trial court erred in precluding the defense from calling an expert witness to rebut the officer's opinion; and (5) whether the trial court erred in allowing the State to present evidence of the defendant's application for food stamps, in contravention of state and federal law. Having reviewed the record and found no reversible error, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOSEPH M. TIPTON and NORMA MCGEE OGLE, JJ., joined.

Susan E. Shipley, Knoxville, Tennessee, for the appellant, Christopher Kevan Hein.

Paul G. Summers, Attorney General and Reporter; Elizabeth B. Marney, Assistant Attorney General; Randall Eugene Nichols, District Attorney General; and Leslie R. Nassios and Leland L. Price, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

The victim in this case, Angela Bane, was the live-in girlfriend of the defendant and the mother of his baby daughter. According to the various friends, family members, and coworkers who testified at trial, the defendant was extremely jealous and possessive of the victim, and the couple's relationship was marred by frequent arguments, periods of separation, and, shortly before the victim's death, an order of protection that the victim took out against the defendant. However, at the time of victim's death, the couple were not only living together again, but also working together for the same painting contractor.

On Monday, March 8, 1999, the defendant and the victim became involved in such a heated argument at work that their supervisor had to separate them. According to the supervisor's testimony, the defendant arrived at work alone the following day, said the victim had left and he did not know where she had gone, and asked for her paycheck. The story the defendant told a coworker, however, was that the victim was still at home, but that he feared she would soon leave him.

In the days that followed, the defendant offered varying stories to friends and acquaintances about the victim's disappearance, telling one person that the victim had gone to the store and failed to return, others that she had left during the night while he and their child were asleep, and still others that she had left on March 9 while he was at work. One of the couple's coworkers, Tina Huskey, testified that when she pressed the defendant on Wednesday for more details, asking if he had heard from the victim, he responded that he had not and guessed he was going to have to tell his daughter that the victim had run off, gotten killed, and would not be back. According to Huskey, the victim's purse remained in the front seat of the defendant's car for the remainder of that week.

Margaret Hewitt, an employee of the Department of Human Services ("DHS"), testified that DHS records showed that the defendant applied for benefits on March 9, 1999, telling a caseworker that the victim had disappeared on March 2, 1999, and he did not know her current whereabouts. Hewitt acknowledged on cross-examination that she had not spoken to the defendant, there was no way to correct typographical mistakes in the report, and that one place in the report erroneously referred to the defendant as "Christopher Bain," which she assumed was a typographical error.

On Thursday, March 11, 1999, the defendant called the police to his mother's residence to report the victim missing. Knoxville Police Officer Frank Carraher, who responded to the call, testified the defendant told him that he and the victim had argued and the victim was gone when he returned home from work on Monday evening. Officer Carraher said he did not file a missing person's report because the defendant had not yet contacted the victim's family in Loudon County.

On March 13, the defendant telephoned the victim's aunt and cousin to report the victim missing. He also contacted the victim's sister, Tina Bane, who subsequently filed a missing person's report with the Knoxville Police Department after viewing news reports about the discovery of a burned body in Jefferson County. Bane testified that the defendant gave her two different versions of the victim's disappearance, initially telling her that the victim was gone when he awoke on March 9, and later that the victim had told him on the morning of March 9 that she did not feel like going to work that day and was gone when he returned home that evening. Around the same period of

time, the defendant began telephoning area hospitals and law enforcement agencies to inquire about the victim, including Jefferson Memorial Hospital in Jefferson County on March 13, where he asked the registration clerk if the hospital covered the area around Interstate Exit 417 in Jefferson County.

On March 16, 1999, employees of a tree trimming service discovered a woman's burned remains in the woods at a pull-off beside Dumplin Loop Road in Jefferson County. The body was only partially burned, and a wristwatch, a brown ponytail, and portions of the clothing were recovered. In their efforts to identify the victim, investigators with the Jefferson County Sheriff's Department, working in conjunction with agents from the TBI, reviewed missing person's files throughout the state and asked, via the media, for anyone with information to come forward. After eliminating several other possibilities, they began to suspect that the body was that of the defendant's missing girlfriend. Their suspicions were ultimately confirmed when the victim's sister positively identified the victim by the panties, long underwear, red jumpsuit, and wristwatch recovered with the body, as well as by the scar on her forehead.

Dr. Cleland Blake, the pathologist who performed the autopsy of the victim's body, testified that she had been dead for five to seven days at the time of the discovery of her body and that the homicide had not occurred where the body was found. He testified an accelerant had been used, but the body had been only partially burned. Portions of a red jumpsuit were found, as well as other charred material and several remnants of coiled nylon rope. The left hand and lower portions of both legs were gone, and chew marks on the remaining portions of the body indicated the limbs had been eaten by canine-type carnivores sometime after the body was burned. Premortem injuries consisted of lacerations to the left side of the face, including a large laceration to the left jaw caused by a "hard object," fractures to the left lower jaw, fractures to the upper jaw, and blunt trauma to the right side of the face. Dr. Blake testified that the force to the left side of the face came from below and was severe enough to "snap the head back, and break the base of the skull where the skull fastens onto the first cervical vertebra." Additional injuries included a stab wound to the victim's torso that went through the left ventricle of the heart and the left lower lobe of the lung, and a "traumatic injury where something [had] been crammed into her bottom of her body ripping up the rectum and tearing up the back wall of the vagina." Dr. Blake testified that the cause of death was "[m]ultiple blunt traumatic injuries" that rendered the victim paralyzed, with the "final and definitive cause of death" being the stab wound that caused her to bleed to death. He acknowledged on cross-examination that all of the injuries could not have been caused by a single karate punch, and conceded he had initially attributed the marks on the victim's bones to chainsaw activity.

Before the victim was identified, TBI Special Agent David Ridenour and Jefferson County Sheriff's Department investigators, including Chief Deputy Bud McCoig, investigated several men in connection with the case, including Jefferson County resident George Cate, who sometimes stayed in a trailer on his brother's farm near the burn site. The investigators had received a tip that one of Cate's girlfriends might be missing, and, after the body was discovered, Cate brought a car title and a cigarette lighter that he claimed to have found at the Dumplin Loop Road site to Sheriff Davenport of the Jefferson County Sheriff's Department. In addition, Cate's cousin, Jason Shults, reported to investigators that Cate told him after the body was discovered, "[T]hat bitch won't bother anybody

else." Sheriff Davenport interviewed Cate at the Sheriff's Department on March 19, 1999, and on March 24, 1999, he and Deputy McCoig went to Cate's trailer, where they spoke with him again. At some point during this time, Cate also appeared with his attorney and two bail bondsmen at the TBI office in Knoxville, stating that he understood investigators were looking for him. However, his attorney would not allow investigators to interview him at that time. Cate was eventually eliminated as a suspect when both of his girlfriends were found alive and well.

On April 9, 1999, Deputy McCoig, Agent Ridenour, and Benny French, a criminal investigator with the Knoxville Police Department, interviewed the defendant at the Knoxville Police Department. All three officers testified that the defendant voluntarily came in to talk with them, was not under arrest, never asked for an attorney, and was not threatened or induced to talk. The interview lasted until the early morning hours of April 10 and was recorded on two videotapes, the second of which contains no sound. French explained that the video equipment was new and that he apparently did something wrong when loading the second tape into the machine. He denied his actions were deliberate and said he sincerely wished the mistake had not been made.

Ridenour testified that the identity of the victim had just been confirmed when they conducted the April 9 interview with the defendant. He said he informed the defendant four separate times during the interview that the victim was dead, but that he appeared oblivious to the information, failing to express any grief or remorse or to ask where the victim was or what had happened to her. Ridenour acknowledged that he also told the defendant several times during that interview that he would be charged with the first degree murder of the victim.

Ridenour's next contact with the defendant occurred on April 20, when he and McCoig went to the defendant's place of employment to speak with him again. McCoig testified that the defendant's tearful comment that he had not done those things to the victim's body, made during a smoke break at the April 9 interview, led him to believe that the defendant wanted to tell him more and was the reason he and Ridenour went to the defendant's workplace on April 20. He said Ridenour waited on the porch of the defendant's employer's office building while he spoke alone to the defendant beside the car, asking if there was anything he wanted to get off his chest. At that point, the defendant broke down, confessing that he had struck and killed the victim on March 8 at their apartment and had later hired an African-American man he found at the Tennessee Tavern to dispose of her body.

After reading the defendant his Miranda rights, Agent Ridenour and Deputy McCoig drove him to the Tennessee Tavern to see if he could identify the African-American man he had described. During their conversation in the car, which was tape-recorded and admitted as an exhibit at trial, the defendant stated that he and the victim had continued to argue when they arrived home from work on Monday, March 8, and that she had given him a one-week ultimatum to get out of the apartment. According to the defendant, the victim threatened to call the police and began hitting him. At that point, he struck her once in the temple with a karate chop and she fell down dead. The defendant told the officers that he left the apartment with his daughter and later paid the African-American man $1000 to remove and dispose of the body on Thursday of that week. He told the officers he had

given the apartment's keys to the man and had instructed him to take the money from the victim's purse, which was in the apartment.

In his subsequent videotaped confession, the defendant changed his story slightly, stating that he and the African-American man had together carried the victim's body from the apartment, placed it in the trunk of his car, and driven it to Jefferson County where they had dumped it beside a road in the country. The defendant claimed his accomplice drove his vehicle, and he rode in the passenger seat.[1] He never admitted stabbing or burning the victim.

A search of the defendant's apartment and vehicle, conducted with the defendant's consent on April 9, 1999, failed to uncover any physical evidence linking him to the crime, and tire tracks found at the burn site did not match the tires on his vehicle. However, the lower walls of the bathroom in his apartment showed signs of recent painting. Moreover, the descriptions he provided of the dump site and the clothing the victim was wearing were consistent with what the investigators already knew. The defendant stated that the victim's hair was tied in a ponytail, that she was wearing a red jumpsuit and long underwear, and that her body was wrapped in a comforter and bound with nylon cord.

The defendant elected not to testify, but called several witnesses in his defense. Among the evidence he sought to present were tape-recorded statements that Thomas Hendrix, an unavailable witness, made to an undercover drug informant in March 2002 and to a TBI investigator in April 2002, in which he allegedly related that he had seen George Cate kill a young woman at a bar two or three years earlier, and had helped him dispose of the body on Dumplin Valley Road.[2] The trial court ruled the tape recordings inadmissible hearsay, but allowed the defendant to introduce Hendrix's videotaped deposition, recorded on May 29, 2002, while Hendrix was recovering at a rehabilitation center from a broken hip.

In his deposition, the sixty-eight-year-old Hendrix, who was unable to tell what month or day his hip had been broken and thought the current year was 2000, related a time several years earlier when he and George Cate had spent the day together drinking. He said they had gone in the afternoon of that day to a beer joint in Sevier County. Hendrix recounted that a young, blondish-haired woman dressed in blue jeans and a jacket came into the establishment with her boyfriend, that the two began arguing and shoving each other, and that a fight broke out when one of the men in the place went to the woman's defense. As a result, the owner threw everyone out of the establishment.

---

[1] Although the defendant drew a picture of this alleged accomplice, he was unable to pick his photograph out of mug shots he was shown at the police station, and officers were unable to confirm that such a person actually existed.

[2] The tape recordings of these conversations are not included in the record before this court. However, a written statement in which the confidential informant described her conversations with Hendrix was admitted as an exhibit for identification purposes only. In the statement, the informant stated that Hendrix told her that he saw Cate stab and kill a woman at a beer joint and that he helped him dispose of the body by transporting it to Dumplin Valley Road in his car, where it was set on fire. Hendrix allegedly told the informant that the body was gone when he returned to the burn site the following morning.

When Hendrix went outside, he saw Cate and two other men standing over the woman's lifeless body. Blood was coming from the woman's mouth and nose, but he saw no other injuries to her body. Hendrix said that someone told him that the woman's boyfriend, who was gone by the time he got outside, had committed the murder. He stated that Cate helped the other men put the body in their car and then rode with him in his car as he followed their vehicle to Dumplin Valley Road,[3] where they dumped the body and set it on fire. Hendrix denied having participated in the transportation or burning of the body. He said he did not see Cate kill the woman and denied having ever told anyone that he had.

At the conclusion of the trial, the jury convicted the defendant of the lesser-included offense of criminally negligent homicide, a Class E felony, which carries a sentence range of one to two years for a standard offender. See Tenn. Code Ann. § 40-35-112(a)(5) (2003). Because the defendant had already served almost four years by the conclusion of the trial, the trial court released him on bond pending the sentencing hearing. The court subsequently sentenced him as a Range I, standard offender to two years in the Department of Correction, declared the time already served, and officially released him from custody.

## ANALYSIS

### I. Hendrix's Unsworn Statements to Informant and TBI Agent

As his first issue, the defendant contends that the trial court erred in precluding him from presenting the audiotaped statements Hendrix made to the undercover drug informant and to the TBI investigator. He argues the evidence was admissible as a declaration against Hendrix's penal interest and, further, that its preclusion violated his constitutional rights to present a complete defense because it would have provided the jury with the context for Hendrix's deposition testimony, revealing that the information was originally elicited by the prosecution. The State argues that the trial court properly ruled the unsworn statements inadmissible hearsay and points out that, despite their preclusion, defense counsel was able to argue at closing that George Cate was the perpetrator, based on other evidence presented at trial, including Hendrix's deposition testimony.

During a jury-out hearing, the confidential drug informant informed the court that Thomas Hendrix had deliberately hidden himself from process, retreating to a mountaintop near Polk County that was "so far back" "in the boonies" that it was "not even on the map." Thus, there was never any question that the witness was unavailable at trial. Tennessee Rule of Evidence 804 provides, in pertinent part:

> The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
>
> . . . .

---

[3]According to Dr. Blake, Dumplin Loop Road branches off Dumplin Valley Road.

-6-

(3) Statement Against Interest. – A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or *so far tended to subject the declarant to civil or criminal liability or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless believing it to be true.*

Tenn. R. Evid. 804(b)(3) (emphasis added). The Advisory Commission Comments to the rule state that "[t]his rule follows modern Tennessee law by admitting declarations against penal interest as well as those against pecuniary or proprietary interest."

The defendant argues that Hendrix's statements constituted declarations against his penal interest because they exposed him to potential prosecution for the abuse of a corpse and/or obstruction of justice. However, although the defendant asserts that Hendrix described having helped "transport and burn a dead body," the confidential informant's recounting of Hendrix's statements does not make it clear whether Hendrix admitted his participation in the actual transportation and burning of the body, or whether, as with his deposition testimony, his claim was of merely having been present. As related by the confidential informant during the jury-out hearing at trial, the essence of Hendrix's admission was as follows:

> Okay. The details are the girl was stabbed. Her throat was cut. He [Cate] picked her up by the neck with one hand and squeezed the life out of her until her – something in here was broke, the bone in her neck to where her head was almost decapitated. He [Hendrix] stated she was 25 years old. She was at a little beer joint up in Sevierville. There was a lot of people there. I'd rather not say the other people's names that was involved, a lot of them. They all got in a fight up there. They was all drinking. She was stabbed out the back door in the yard behind a fence. They took her body down to Dumplin Valley Road and set it on fire, and she was charcoaled.

Even if Hendrix admitted his actual participation in the destruction of the corpse, the circumstances surrounding his original statement do not support a finding that it was sufficiently reliable to be admitted as a declaration against his penal interest. The informant, who said she had known Hendrix for approximately eleven years, testified she was "after drugs on [Hendrix's] brother" when he first told her the story about the woman. A later conversation with Hendrix occurred as they were riding together in a car. She acknowledged Hendrix was an elderly alcoholic who had been diagnosed with "an alcohol-induced thinking disorder" but insisted that, according to his family physician, there was "not a thing wrong with his thinking" and that he was "absolutely not senile."

As stated in Neil P. Cohen et al., Tennessee Law of Evidence § 8.36[5] (4th ed. 2000):

> The cornerstone of the declaration against interest hearsay exception in Rule 804(b)(3) is that a reasonable person similarly situated to the declarant would not have made the statement unless the reasonable person believed it was true. In turn, this statement means that a reasonable declarant would have realized it was against his or her interest. The important time is when the statement was made.
>
> Rule 804(b)(3) does not specifically provide that the declarant must have personally known that the statement was against his or her interests when it was made. However, this knowledge is the reason the hearsay statement is viewed as sufficiently reliable to be admitted, and the evidence should not be admitted if it is established that the declarant did not know that the statement was harmful. For example, if the declarant actually believed that he or she was saying something that would be helpful, reliability is questionable and the statement should not be admitted under this hearsay exception.

The record reveals, as we have stated, that Hendrix was an elderly alcoholic who first told the story in casual surroundings to a longtime acquaintance. In the year preceding his deposition, a hospital psychologist had apparently diagnosed him with an alcohol-induced thinking disorder. During the deposition, the witness was unable to state the accurate current year or what day or month he had sustained his broken hip. Thus, even if he admitted his participation in the transportation and burning of the corpse to the confidential informant and later to the TBI investigator, it is highly doubtful, given his history and condition, that he would have done so with the realization that he was potentially exposing himself to criminal prosecution. Therefore, we conclude that the trial court did not abuse its discretion by excluding Hendrix's unsworn statements on the basis that they constituted inadmissible hearsay. We further conclude that the preclusion of the statements did not violate the defendant's constitutional rights to present a defense. As the basis for this determination, we note that, among other things, defense counsel was able to bring out at trial the fact that other potential suspects, including George Cate, had been investigated, and why; to point out discrepancies between the defendant's confession and the manner of the victim's death; and to argue at closing that the crime was committed by someone other than the defendant.

## II. George Cate's Statements to Law Enforcement Officers

The defendant next contends that the trial court erred in precluding statements that George Cate made to the Jefferson County sheriff on March 19, 1999, and to TBI officers on May 15, 2002. He argues that Cate's statements were admissible as declarations against his penal interest because they placed him in the company of Hendrix at the pull-off where the victim's body was found on the day that the body was discovered, thus corroborating Hendrix's account of the crime. The State

argues that the trial court properly excluded the evidence as hearsay that did not fall within any of the recognized exceptions.

During the State's case in chief, the defendant sought to elicit information from Deputy McCoig about the contents of Cate's conversation with Sheriff Davenport on March 19, 1999.[4] However, the trial court ruled the information was inadmissible double hearsay. Subsequently, the defendant called TBI Agent Chad Smith, who testified that, after first interviewing Hendrix, he took a statement from Cate in the presence of his attorney on May 15, 2002. He said that Cate told him he was staying in both Roane and Jefferson Counties in March 1999 and had made a trip during that time to the Dumplin Valley Road area. The State objected to any further testimony on the grounds of hearsay, and the trial court sustained the objection. In the jury-out proffer that followed, Agent Smith testified that Cate stated that he and Hendrix were traveling together in March 1999 from Roane County to his trailer, drinking along the way, when he felt the need to urinate. Agent Smith said that Cate told him he pulled off to the side of Dumplin Loop Road, opened his car door, and saw by the illumination of his dome light a car title, cigarette lighter, and possibly a letter.[5] Cate stated that he turned the items in to the Jefferson County Sheriff's Department.

In ruling that the statement did not qualify as a declaration against interest, the trial court observed that Cate did not admit to anything more incriminating than having been in the vicinity of where the body was found:

> I'm reading the rule, and the rule says that it has to be a statement so far – so tendered to subject the declarant to civil or criminal liability as to render invalid a claim by the declarant against another – I don't think this fits into that category. The fact that he's going to a particular part of the county in a particular month and a particular year doesn't, in my judgment, make it a statement against interest. So I'm not going to allow you to elicit from this witness statements made by Mr. Cate to him.

We agree with the trial court's assessment of the evidence. Cate's statement, as related by Agent Smith, merely placed him at the site where the body was found during the same time period that the body was discovered. We note that the essential information contained in the statement, that Cate had found a car title and cigarette lighter during the same time frame as the discovery of the body, was provided through the testimony of various law enforcement personnel. We further note that the defendant was able to elicit from various State witnesses the information that no one involved in the discovery or investigation of the body had seen a car title or lighter at the scene, thus casting some doubt on Cate's account of how and when he recovered the items.

---

[4] Although it is not entirely clear from the record, this appears to be the date that Cate turned the car title and cigarette lighter over to the sheriff's department.

[5] Agent Smith was uncertain about the latter item.

### III. TBI Agent Ridenour's Opinion Testimony

The defendant next contends that the trial court erred by allowing Ridenour to offer his opinion testimony about the tendency of suspects during interrogation to minimize their involvement in crimes. During cross-examination, Ridenour acknowledged that he had most recently worked for an electronics company but was currently unemployed. On redirect examination, he testified that, after working for the TBI, he had run a homicide unit for the United Nations International Police Task Force in Kosovo for fifteen months, during which time he had investigated over 300 murders. Without seeking to qualify him as an expert in the field of interrogation techniques or the typical behavior exhibited by suspects during interrogation, the State asked for his opinion as to the reason for the discrepancies between the defendant's account of the murder and the injuries found on the victim:

> Q   Now, with respect to this investigation, do you have an opinion regarding why [the defendant's] descriptions of [the victim's] injuries don't match, the actual injuries that she sustained?
>
> [DEFENSE COUNSEL]:  Well, your Honor, I would object to his opinion.
>
> THE COURT:  Sustained.
>
> [PROSECUTOR]:   This is an investigator, your Honor, please.  He investigated the case.  I think he can explain why he –
>
> THE COURT:  I disagree.
>
> . . . .
>
> Q   In your experience as a law enforcement officer, is it -- has it been your experience that a defendant may try to minimize the actual extent of his crime?
>
> A   Certainly, yes.
>
> Q   Could you relate an example for us?
>
> [DEFENSE COUNSEL] :  I would object to that, your Honor.
>
> THE COURT:  I don't know.  I want to hear it.  Go ahead.
>
> A   Without specifics, if you had someone who's maybe killed someone and raped them, they might be willing to admit to the

murder but not to the rape. I've had defendants perfectly willing to admit to a homicide, but they didn't want to tell they were in an area to purchase drugs, because they didn't want their mama to know they were buying drugs or they didn't want their girlfriend to know they were cheating on her. They were at the wrong place at the wrong time. They're willing to admit to the murder but not to certain . . . parts of it, and you often don't ever get the entire reasons or the truth.

The defendant argues that Ridenour's testimony "encroached an area more properly reserved for a qualified expert witness" and invaded the province of the jury by constituting a commentary on the credibility of the defendant's confession. The State argues that the defendant has waived the issue on appeal by failing to raise a specific objection at trial. In the alternative, the State argues that Ridenour's testimony constituted a properly admissible lay opinion based on personal observation and experience, rather than an expert opinion based on scientific, technical, or specialized knowledge.

As an initial matter, we agree with the State that the defendant should have stated the grounds for his objection more clearly. See Tenn. R. Evid. 103(a)(1) (providing that timely objection for purposes of preserving the issue for appeal must state "the specific ground of objection if the specific ground was not apparent from the context").

Tennessee Rule of Evidence 701 provides that a lay witness's testimony in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue. Tenn. R. Evid. 701(a). Because it is within the province of the jury to draw conclusions from facts in evidence, a "non-expert witness must ordinarily confine his testimony to a narration of facts based on first-hand knowledge and avoid stating mere personal opinions." State v. Middlebrooks, 840 S.W.2d 317, 330 (Tenn. 1992), superseded by statute on other grounds as recognized by State v. Stout, 46 S.W.3d 689 (Tenn. 2001).

Tennessee Rules of Evidence 702 and 703 govern the admissibility of expert testimony. Rule 702 provides:

> If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise.

Evidence is "scientific, technical, or other specialized knowledge if it concerns a matter that 'the average juror would not know, as a matter of course[.]'" State v. Murphy, 953 S.W.2d 200, 203 (Tenn. 1997) (quoting State v. Bolin, 922 S.W.2d 870, 874 (Tenn. 1996)). Rule 703, "Bases of

Opinion Testimony by Experts," provides that "[t]he court shall disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness."

This court addressed a similar issue in State v. Smith, 42 S.W.3d 101 (Tenn. Crim. App. 2000), a case in which the defendant challenged the trial court's admission of testimony by two police officers about "the manner in which offenders make confessions during questioning by police." Id. at 110. Specifically, the officers in Smith described a pattern of behavior in which a suspect first repeatedly denies his involvement before ultimately confessing when faced with details about the crime and the evidence against him. Id. at 110-11. We concluded that the testimony should not have been admitted because it was neither relevant nor helpful to the jury:

> First, the testimony was simply not relevant. Rule 401 of the Tennessee Rules of Evidence states that "'[r]elevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Here, the general behavior of other criminal suspects during questioning by police had no value in the determination of whether Defendant was guilty of the offenses for which he was charged in this case. Second, evidence about the behavior of criminal suspects in other cases did nothing to assist the trier of fact to understand the evidence or determine a fact in issue. Further, there was absolutely no evidence from which it can be determined that the underlying facts or data upon which Brown and Greene relied on in reaching their opinions were trustworthy. Therefore, the challenged testimony of Brown and Greene was not admissible expert opinion testimony.

Id. at 112.

We also rejected the State's argument, identical to the one it makes in this case, that the testimony was admissible lay opinion based on the officers' personal experiences:

> The fact that the challenged opinion testimony came from lay witnesses rather than expert witnesses does not make the evidence any more relevant. The testimony was simply of no help to the jury in determining a fact in issue. Moreover, Rule 403 of the Tennessee Rules of Evidence states that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . ." Even if this testimony was somehow relevant, its minimal probative value was substantially outweighed by the unfair prejudice of its tendency to imply that because criminals always deny their crimes before admitting to them, Defendant is a criminal because he also denied his offenses before confessing to

them. Thus, the challenged testimony was not admissible as the opinion of lay witnesses.

Id. Nonetheless, we found the error in admitting the testimony to be harmless given the strength of the evidence against the defendant. Id.

In this case, we likewise conclude that the testimony, as to a suspect's often admitting only certain facts or elements of the crime, was irrelevant and potentially prejudicial and, thus, inadmissible, but the error in admitting it was harmless. See Tenn. R. App. P. 36(b) ("A final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process."). The challenged testimony comprises only a brief portion of a large record. Moreover, in spite of substantial evidence against him, which included his confession to police that he had killed the victim and dumped her body, the defendant was convicted of only criminally negligent homicide. We conclude, therefore, that the defendant is not entitled to relief on this issue.[6]

## IV. Expert Witness's Rebuttal Testimony

As his fourth issue, the defendant contends that the trial court erred by refusing to allow him to present generalized expert testimony on false confessions and police interrogation techniques. The defendant initially sought to present the testimony of Dr. Richard Ofshe, Ph.D., a sociology professor, as part of his case in chief. At a February 4, 2003, pretrial hearing, the defendant testified, *inter alia*, that he fabricated his confession because the police told him that he had failed a polygraph test, kept insisting that he had killed the victim, threatened him with the death penalty, and promised he would receive a lesser charge if he confessed. Dr. Ofshe testified at length about coercive interrogation techniques and the phenomenon of false confessions and opined that, based on the defendant's account, "psychologically coercive tactics" were employed by law enforcement officers during his interrogation. By order entered February 12, 2003, the trial court overruled the State's motion to exclude Dr. Ofshe's testimony, ruling that the defendant had put the credibility of his statements at issue by testifying that the statements "were false and the product of interrogation techniques employed by law enforcement personnel." The trial court made it clear, however, that its ruling was based on the defendant's testifying and thus placing the credibility of his statements at issue at trial.

The defendant ultimately elected not to testify. Nonetheless, defense counsel argued that Ridenour's anecdotes about defendants minimizing their involvement in crimes opened the door to

---

[6]We note, however, that there is authority supporting the State's position on this issue. In State v. Skillicorn, 944 S.W.2d 877, 892 (Mo. 1997), the court determined that, in response to a prosecutor's question as to whether suspects "downplay their involvement," the FBI agent was allowed to respond that they do so, and it is called "minimizing." The court determined further that, even if admission of this testimony were error, it was harmless.

rebuttal testimony by Dr. Ofshe "as to generalized police interrogation tactics." The trial court denied the request, stating:

> I did not rule that Dr. Ofshe could testify as to generalized police interrogation tactics. The reason I allowed the testimony in this case, and it's very clear in the order that I entered, is because he went further in this case and personally was able to state based on interviews with [the defendant] and other information that was specific to this case particularly that he was able to arrive at some conclusions based on his education, training, and experience that I found after listening to his testimony, and listening to the testimony of [the defendant] at the pretrial hearing, I thought fit the parameters of the rule. But if it's -- if it's generalized testimony only, that changes my mind, and I'm not going to allow him to testify strictly on the issue of generalized police interrogation tactics and false confessions, unless it's specific to this case.
>
> . . . .
>
> The clear representation you made to me and you have made all along is that [the defendant] was going to testify, and indeed, has testified in this case as to what transpired during the interrogations by the police department.
>
> . . . .
>
> And although we did it out of order because of your representation to me, Dr. Ofshe then testified based on that information that would have been -- that was in front of me and would have been in front of the trier of fact, based on what you told me was going to transpire, he was able to arrive at certain conclusions. Without that . . . and what he would have to testify to here now is the hearsay statements of [the defendant], and those are . . . self-serving statements by [the defendant] to -- off the record, without being tested by cross-examination that he's basing his opinion on. I don't think that that's a proper . . . basis in this case.

The defendant argues that the trial court's ruling violated his Sixth Amendment right to present a defense by "forcing him to choose between it and . . . his Fifth Amendment right to remain silent." The State argues that the trial court properly excluded the testimony because criminal interrogation techniques were not made an issue at trial.

The trial court is given broad discretion in resolving questions concerning the admissibility of expert testimony, and we will not overturn its ruling absent a finding that it abused its discretion. See State v. Stevens, 78 S.W.3d 817, 832 (Tenn. 2002), cert. denied, 537 U.S. 1115, 123 S. Ct. 873, 154 L. Ed. 2d 790 (2003); State v. Coley, 32 S.W.3d 831, 833 (Tenn. 2000); State v. Ballard, 855 S.W.2d 557, 562 (Tenn. 1993). "The abuse of discretion standard contemplates that before reversal the record must show that a judge 'applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining.'" Coley, 32 S.W.3d at 833 (quoting State v. Shirley, 6 S.W.3d 243, 247 (Tenn. 1999)).

We find no abuse of discretion by the trial court in disallowing the proposed testimony. In State v. Ballard, 855 S.W.2d 557, 561-62 (Tenn. 1993), our supreme court held that the trial court erred in admitting expert testimony in a child sexual battery case about the constellations of symptoms, consistent with post-traumatic stress disorder, exhibited by child victims of sexual abuse. The court ruled that such generalized testimony invaded the province of the jury in making credibility determinations:

> In the context of a criminal trial, expert scientific testimony solicits the danger of undue prejudice or confusing the issues or misleading the jury because of its aura of special reliability and trustworthiness. This "special aura" of expert scientific testimony, especially testimony concerning personality profiles of sexually abused children, may lead a jury to abandon its responsibility as fact finder and adopt the judgment of the expert. . . . Expert testimony of this type invades the province of the jury to decide on the creditability [sic] of witnesses.

Id. (citation omitted).

Relying in part on its holding in Ballard, our supreme court similarly concluded in Coley that generalized expert testimony on the reliability of eyewitness identifications, besides being unnecessary, runs the risk of encouraging the jury to abandon its responsibility as fact finder. Coley, 32 S.W.3d at 837. Consequently, the Coley court found that such generalized and unparticularized expert testimony does not substantially assist the trier of fact and, thus, is inadmissible under Tennessee Rule of Evidence 702. Id. at 838.

We, likewise, conclude that Dr. Ofshe's generalized testimony about police interrogation techniques and the phenomenon of false confessions was neither necessary for the jury to understand a fact in issue, nor warranted under the circumstances. In the absence of testimony by the defendant that he had been coerced into making his confession, Dr. Ofshe's generalized testimony about coercive police interrogation techniques and the fact that false confessions exist would not have "substantially assist[ed] the trier of fact to understand the evidence or to determine a fact in issue," Tenn. R. Evid. 702, and would have run the risk of misleading and confusing the jury. Tenn. R. Evid. 403. We agree with the State that the Seventh Circuit Court of Appeals opinion the defendant

-15-

cites in support of this issue, United States v. Hall, 93 F.3d 1337 (7th Cir. 1996), is inapposite to this case. Unlike here, the defendant in Hall, in which the exclusion of Dr. Ofshe's expert testimony was found to be error, made the credibility of his statements an issue at trial by resting his entire theory of defense, supported by the testimony of a psychiatrist and a psychologist, on the proposition that he suffered from a personality disorder that made him "susceptible to suggestion and pathologically eager to please." Id. at 1341.

In State v. Davis, 32 S.W.3d 603, 608 (Mo. Ct. App. 2000), the defendant had sought to call during his trial an expert in the field of interrogation psychology who would testify "about interrogation techniques, how such techniques influence criminal suspects, . . . whether the techniques correlate to false confessions . . . how and why false confessions occur and principles to use to evaluate the reliability of a confession." However, the appellate court explained why the trial court had not abused its discretion in disallowing this testimony:

> [T]he fact that police interrogation may be persuasive or coercive does not leave defendant without protection if the trial court denies expert testimony on this topic. Cross-examination is an adequate tool to expose police conduct, and closing argument gives the defendant a forum to further develop his theory that interrogation techniques are coercive. The jury is capable of understanding the reasons why a statement may be unreliable; therefore, the introduction of expert testimony would be "a superfluous attempt to put the gloss of expertise, like a bit of frosting, upon inferences which lay persons were equally capable of drawing from the evidence." [State v.] Lawhorn, 762 S.W.2d [820,] 823 [(Mo. 1988)] (quoting State v. George, 194 Conn. 361, 481 A.2d 1068, 1075 (1984)).

Id. at 609.

Considering these authorities, we conclude that the testimony of Ridenour did not open the door for Dr. Ofshe then to testify in rebuttal. In fact, Ridenour gave only a single short response, stating that a suspect often will admit only part of the offense for which he is accused. This testimony did not open the door for an exposition on the psychology of interrogations and confessions. Accordingly, we conclude that the trial court did not abuse its discretion in disallowing the testimony of Dr. Ofshe.

## V. Evidence of Defendant's Application for Food Stamps

As his final issue, the defendant contends that the trial court erred in admitting evidence of his application for food stamps, in contravention of state and federal regulations that protect the

confidentiality of such information.[7]  The State responds by arguing, *inter alia*, that the trial court correctly determined that information that the defendant reported that the victim had left on March 2, rather than March 8, was relevant to the case.  The admission of evidence is largely a matter of the trial court's discretion, and we will not disturb its rulings absent a clear abuse of discretion.  See State v. Harris, 30 S.W.3d 345, 350 (Tenn. Crim. App. 1999).

We find no abuse of discretion in the trial court's admission of Hewitt's limited testimony with respect to the defendant's application for food stamps or in its admission of the brief excerpts from the record as an exhibit.  Prior to trial, the Department of Human Services filed a motion for a protective order with respect to the records.  The DHS lawyer explained at the pretrial hearing the specifics of the department's request:

> I do have records with me that I asked Ms. Hewitt to prepare and depending on how the Court would rule in this matter -- the reason we filed this motion in the first place, your Honor, is because the subpoena was given to Ms. Hewitt, and she did give some oral information.  There's some question perhaps that she should not have done that, but the cat's out of the bag, and it's too late for that.  So all we're here for, your Honor, is to request that the information is used and disseminated in the context of this trial, that it remain with the trial, and I hadn't even thought about the fact that this was a jury trial.  So it may be necessary, depending on how things go, for the Court to admonish the jury not to discuss any of DHS' records.

The trial court reviewed the records in camera, determined that the information the defendant provided to the caseworker about the victim was relevant, and ordered that copies of the record be released to the prosecutor and to the defendant's counsel, with instructions that it be used only in preparation for the case.  Thereafter, the trial court allowed the State to call Hewitt to testify about the information contained in the records and admitted the relevant portions as an exhibit, without objection from defense counsel.  We can find no fault with the manner in which the trial court handled the matter.

---

[7] A federal regulation restricts the "[u]se or disclosure of information obtained from food stamp applicant" to (1) persons directly connected with the administration or enforcement of the program, other federal assisted programs, or federally assisted state programs; (2) "[p]ersons directly connected with the administration or enforcement of the programs which are required to participate in the State income and eligibility verification system . . . ."; (3) persons directly connected with the verification of the immigration status of aliens; (4) persons directly connected with the administration of the Child Support Program; (5) employees of the Comptroller General's Office; (6) local, state, or federal law enforcement officials for the purpose of investigating an alleged violation of the Food Stamp Act or regulation; and (7) "[l]ocal, [s]tate, or [f]ederal law enforcement officials, upon their written request, for the purpose of obtaining the address, social security number, and . . . photograph of any household member, if the member is fleeing to avoid prosecution or custody for a crime, or an attempt to commit a crime, that would be classified as a felony (or in the State of New Jersey, a high misdemeanor), or is violating a condition of probation or parole[.]"  7 CFR § 272.1(c)(1) (2004).  A state regulation provides similar restrictions on the release of "Family Assistance Information."  See Tenn. Comp. R. & Regs. 1240-1-13-.01 (1996).

## CONCLUSION

Having reviewed the record and found no reversible error, we affirm the judgment of the trial court.

_____
ALAN E. GLENN, JUDGE