## STATE OF CONNECTICUT *v.* NOEL J. GEORGE
### (10488)

PETERS, PARSKEY, SHEA, GRILLO and DALY, Js.

Argued June 12—decision released August 28, 1984

*Louis S. Avitabile,* with whom, on the brief, was *John P. Santucci,* for the appellant (defendant).

*Catherine J. Capuano,* special assistant state's attorney, with whom, on the brief, were *Francis M. McDonald,* state's attorney, and *Bradford J. Ward,* assistant state's attorney, for the appellee (state).

SHEA, J. After a jury trial the defendant was convicted of conspiracy to commit larceny in the first degree in violation of General Statutes § 53a-122 and of conspiracy to commit burglary in the third degree in violation of General Statutes § 53a-48 and General Statutes § 53a-103. In his appeal from the judgment the defendant claims error in five rulings of the trial court on evidence and also in the failure to grant his request to charge upon the credibility of a witness for the state. We find no reversible error.

From the evidence the jury could reasonably have found that on April 19, 1979, a forcible entry had been made into a house in Woodbury and that various items, including a collection of Hummel figurines, had been stolen from the premises. About three weeks before the burglary, the defendant had visited the house and had seen part of the Hummel collection.

On June 13, 1979, Edward Benner gave a written statement to the police in which he confessed to the burglary of the Woodbury residence and the theft of the Hummel collection as well as some other property he found within. His statement also implicated the defendant in these crimes.

At trial Benner testified that the defendant told him of the Woodbury residence and wanted him to steal the Hummel collection. He said that after the theft he delivered the collection to the defendant, who paid him between $300 and $500 for his services.

Eileen Snyder, who had an extensive Hummel collection, testified that several years earlier she had purchased some Hummel figurines from the defendant who then used the name Jack Stolfi. In the spring of 1979, the defendant, using the same name, came to her house with two boxes of Hummels, some of which were damaged. After examining them, she paid the defendant between $800 and $1000 for the merchandise. On June 12, 1979, when the police visited her in the course of investigating the theft from the house in Woodbury, she still had in her possession about fifteen of the Hummels received from the defendant, the others having been sold. She delivered the remaining Hummels to the police and they were subsequently identified by the owner as part of the collection which had been stolen in Woodbury on April 19, 1979.

The defendant testified in his own behalf, denying his participation in the theft and any dealings with Eileen Snyder.

I

The defendant claims error in the exclusion of a question related to the interest of the state's principal witness against him, Edward Benner, a self-confessed accomplice in the crimes charged. A few days before the

trial began, Benner had pleaded guilty to four charges arising from the burglary and theft in Woodbury: burglary in the third degree, larceny in the first degree, conspiracy to commit burglary in the third degree and conspiracy to commit larceny in the first degree. He testified that, although he believed he could receive a maximum sentence of sixty years for those offenses, the state had not agreed to make any recommendation concerning the sentence to be imposed.

On cross-examination Benner was asked whether he hoped that his testimony at the defendant's trial would help him at the time he was sentenced for his involvement in the Woodbury crimes. He responded, "I pray a lot." Later in his cross-examination Benner was asked whether he hoped to receive a sentence for the Woodbury crimes which would be concurrent with sentences he was presently serving for some unrelated crimes. The court sustained the state's objection and the defendant excepted to the ruling.[1]

---

[1] The transcript of this portion of the evidence is as follows:

"Q. So, you are hoping that you get a concurrent sentence in this particular case?

"Mr. Ward: Objection, your Honor. Again, he is going into the conviction which he submitted through the records. He can't have it both ways. Either the record or the cross-examination. He made his election.

"The Court: Objection sustained.

"Mr. Avitabile: If your Honor pleases, the question was what he hopes out of this case.

"The Court: He can be hoping to get out tomorrow morning if the jail burned down or something else, too. You know, there are a million things that could happen.

"Mr. Avitabile: The jury is entitled to know that he could get consecutive or concurrent sentences, so forth and so on.

"The Court: I beg your pardon?

"Mr. Avitabile: The jury is entitled to know what the sentencing procedure is that you can get concurrent or consecutive sentences.

"The Court: The records speak for themselves as to anything.

"Mr. Avitabile: Not about the particular case we are talking about here. The case that he pled guilty to—

"The Court: Objection is sustained.

"Mr. Avitabile: May I have an exception.

"The Court: Exception may be noted."

"Cross-examination to elicit facts tending to show motive, interest, bias and prejudice is a matter of right and may not be unduly restricted." *State* v. *Wilson,* 188 Conn. 715, 720, 453 A.2d 765 (1982). The principal purpose of the right guaranteed to an accused "to be confronted with the witnesses against him" by the sixth amendment to our federal constitution is to provide the opportunity for cross-examination. *Douglas* v. *Alabama,* 380 U.S. 415, 418, 85 S. Ct. 1074, 13 L. Ed. 2d 934 (1965); 5 Wigmore, Evidence (Chadbourn Rev.) § 1395. "We have recognized that the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination." *Davis* v. *Alaska,* 415 U.S. 308, 316, 94 S. Ct. 1105, 39 L. Ed. 2d 347 (1974); *Greene* v. *McElroy,* 360 U.S. 474, 496–97, 79 S. Ct. 1400, 3 L. Ed. 2d 1377 (1959).

Although a trial judge has authority to restrict the scope and extent of cross-examination within reasonable limits, this discretion may not be exercised until a defendant has been permitted as a matter of right sufficient cross-examination to satisfy the confrontation clause of the sixth amendment. *United States* v. *Vasilios,* 598 F.2d 387, 389 (5th Cir. 1979). That constitutional standard is satisfied only when a defendant has "been permitted to expose to the jury the facts from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness." *Davis* v. *Alaska,* supra, 318. Although the trial court should have permitted the inquiry concerning Benner's hope for a concurrent sentence on the pending charges, the contrary ruling did not under all the circumstances have the effect of violating the defendant's right of confrontation. The jury had been apprised of the four crimes which Benner had admitted by his plea of guilty and were aware that his sentence upon them had been deferred until after he

had testified against the defendant. They knew that Benner believed he was exposed to a maximum sentence of sixty years for those offenses. The essential point, that Benner was hoping for leniency in the disposition of the charges against him, had been effectively made by the question whether he hoped that his testimony against the defendant would help him at the time he was sentenced and his response thereto, "I pray a lot." Although the state suggests no good reason for disallowing the related inquiry concerning Benner's hope for a concurrent sentence, this isolated ruling does not in the context of the whole case amount to a deprivation of the opportunity to reveal the facts from which the jury "could appropriately draw inferences relating to the reliability of the witness." *Davis* v. *Alaska,* supra, 318.

The defendant points to two circumstances which he contends gave the exclusion of his inquiry about a concurrent sentence significant prejudicial impact: (1) the testimony of Benner's sister that he had no motive to lie because he was already serving a sentence, which had been imposed for crimes unrelated to the Woodbury incident; and (2) a claim to the same effect allegedly made by the state's attorney during final arguments. In respect to the latter, it appears that the arguments were not recorded, no request to do so having been made. Since the state does not concede the defendant's version of what transpired and the closing arguments have not been reconstructed in some other way, we cannot review the defendant's claim as related to the arguments. *State* v. *Killenger,* 193 Conn. 48, 58, 475 A.2d 276 (1984); *State* v. *Vitale,* 190 Conn. 219, 226, 460 A.2d 961 (1983).

The testimony referred to was given during the defendant's cross-examination of Benner's sister, who had testified that she had seen the defendant in a car with her brother several times and that, after her

brother's arrest, the defendant gave her $200 to help pay for his lawyer. This portion of her extensive cross-examination was as follows:

"Q. And, aren't you lying here fingering this man in order to protect your brother?

"A. What good would that do? My brother is already in prison. If I lied on this witness stand and went to jail, there would be no one to care for my six kids. They come first.

"Q. If you lied on this witness stand that it would help your brother with his cases, that would make you happy, wouldn't it?

"A. Would it get him out of jail?"[2]

We see nothing in this testimony, elicited by the defendant, which would have accentuated the minimal prejudice he may have suffered from the exclusion of his inquiry of Benner about a concurrent sentence.

There was a very thorough cross-examination of Benner relating to his credibility. Evidence of his several prior convictions was introduced, including one for giving a false statement under oath to a police officer. It was brought out that Benner had refused to sign the statement he gave to the police implicating the defendant until a felony charge of burglary in the third degree of a house in Prospect was reduced to the misdemeanor of criminal trespass in the second degree. In addition the trial court gave an elaborate charge on the considerations involved in judging the credibility of an accomplice, a "self-confessed criminal," including the observation that "he may in his own mind be looking for or hoping for some favors in the disposition of his own case and . . . may have such an interest in the

---

[2] The court sustained the state's objection to the last question and struck the answer. The defendant excepted to this ruling but has not claimed it as error on appeal.

outcome of the case on trial that his testimony might be colored by that fact." We are persuaded that the ruling complained of did not deprive the defendant of a fair opportunity to bring to the attention of the jury any significant consideration bearing upon the credibility of Benner.

## II

The next ruling claimed as error also is related to the credibility of the state's witness, Benner. A corrections officer, Fran Sultaire, who worked at the Litchfield jail where the defendant was employed in a similar capacity, was called by the defendant as a witness. In the course of his testimony he said that he became acquainted with Benner as an inmate of the prison during the period from January to June, 1979. He testified that during this period he had formed an opinion of "Benner's character trait for . . . truth and veracity" and still had such an opinion. To a question eliciting that opinion the state objected that an inadequate foundation had been laid because Sultaire's observations of Benner were limited to "early '79," an insufficient basis upon which to evaluate Benner's truthfulness at the time of trial in September, 1980. The court sustained the objection and the defendant excepted to the ruling.

We have followed the rule which permits character or disposition to be proved "by the opinion evidence of those who have been shown to have had an opportunity to form, and who have formed, an opinion as to the character of the [subject] with respect to the trait or traits in issue." *State* v. *Blake,* 157 Conn. 99, 104–105, 249 A.2d 232 (1968); *Richmond* v. *Norwich,* 96 Conn. 582, 594, 115 A. 11 (1921). Whether a witness has had sufficient contact with a person to be qualified to testify as to a particular character trait is a matter peculiarly within the discretion of the trial court and "its ruling

will be disturbed only in a clear case of abuse or of some error in law." *State* v. *Rodriquez,* 180 Conn. 382, 389, 429 A.2d 919 (1980); *Siladi* v. *McNamara,* 164 Conn. 510, 513, 325 A.2d 277 (1973). Although the focus of the colloquy in the trial court and of the arguments on appeal has been the lapse of more than a year from Sultaire's last contact with Benner, the fact that their acquaintance was limited to a prison setting and to a period of less than six months was also significant. Benner was held in the Litchfield jail on two or three occasions from January to June, 1979. The record does not disclose the duration of these confinements, except that he was there for ten days in June. It also fails to show the frequency of Sultaire's contacts with Benner as distinguished from other prisoners. The trial court did not abuse its discretion in disallowing the question at issue for lack of a sufficient foundation.

### III

The defendant claims error in several rulings allowing the state to question Sultaire on cross-examination concerning what he would have done if Benner had contacted him under the same circumstances as those in which Benner had been involved with the defendant, as indicated by the evidence.

The theory of the defense was that Benner was "framing" the defendant for his own benefit. Before Sultaire testified, the defendant had taken the stand and admitted that on June 25, 1979, Benner had telephoned him and then brought to his apartment a stereo set which the defendant said he purchased for $800. He claimed to have asked whether the set was stolen and he denied that Benner had told him that it was stolen. He also denied that the purchase price was $300 as Benner had stated.

The state in cross-examining Sultaire asked whether he would have permitted Benner to come to his apartment to show him a stereo set. The court initially sustained the defendant's objection to this line of inquiry. On redirect examination the defendant again brought out that Sultaire had warned him about Benner and that the defendant had indicated his disbelief of that warning. On recross examination, when the state sought to ask the same questions which had earlier been excluded as to what Sultaire would have done if Benner wanted to sell a stereo set to him, the court reversed its previous ruling and, over the defendant's objection and exception, allowed the inquiry. Sultaire testified that he would not have bought a stereo from Benner or allowed him to come to his apartment at night or paid $800 for unwrapped stereo equipment with no evidence of ownership by Benner. The admission of this testimony and the denial of his motion to strike it are claimed as error by the defendant.

The basis for the defendant's objection to this testimony at trial was that the question asked the witness to "make a conclusion," that it was outside the scope of the direct testimony, and that it was irrelevant for the purpose of showing any felonious intent on the part of the defendant. On appeal the defendant no longer presses his claim that the scope of direct examination was exceeded, but continues to adhere to his objections based upon the inadmissibility of the opinion of a lay witness and the irrelevancy of the testimony.

The defendant had presented Sultaire as a corrections officer of ten years experience and had elicited his views on such matters as prison routine, his observations of Benner's extraordinary attempts to ingratiate himself with the defendant, and his characterization of Benner as a "shifty guy" who would try to "jam up" the defendant. On the subject of the relationships between guards and prisoners Sultaire had substantial

expertise, which the defendant himself called upon in his direct examination. The questions asked by the state's attorney as to what Sultaire would have done if a former inmate contacted him under the same circumstances as those which existed when Benner had sold the stereo set to the defendant were within the general field of the specialized knowledge Sultaire had gained from ten years employment as a corrections officer. The admission of this evidence, therefore, did not violate the general prohibition against statements of opinion by lay witnesses because Sultaire was sufficiently qualified to render his views on this subject more valuable to the trier than those of a witness lacking his credentials.

In regard to the relevancy of the inquiry, the fact that an experienced corrections officer would be highly suspicious of a former inmate attempting to sell him stereo equipment under the circumstances referred to tends to indicate that the defendant, a corrections officer of similar experience, also must have realized that the stereo he purchased from Benner was probably stolen, in contradiction of his testimony that he believed otherwise. The testimony was admissible, therefore, not only upon the credibility of the defendant's testimony that he had been duped by Benner in that transaction but also to show that his association with Benner, at a time coinciding closely with the burglary in Woodbury, was not wholly innocent, as he claimed.

## IV

The defendant claims error in several rulings excluding his testimony of what Benner had told him in conversations pertaining to their relationship as prisoner and guard. Although the court permitted the defendant to state what he had said to Benner, objections to Benner's statements were sustained on the ground of hearsay. The defendant concedes that no exception was

taken to these rulings, as required by Practice Book § 288, but now claims a violation of his state constitutional "right to be heard by himself . . . ." Conn. Const., art. I § 8. He also maintains that Benner's out-of-court statements were admissible as an exception to the hearsay rule for the purpose of establishing their effect upon the defendant's mental state, a ground for admissibility not advanced at trial.

The defendant seeks review of these rulings under the exception we have created to the general prohibition against review of claims not raised at trial in instances where it appears that a defendant "has clearly been deprived of a fundamental constitutional right and a fair trial." *State* v. *Evans,* 165 Conn. 61, 70, 327 A.2d 576 (1973). "Putting a constitutional tag on a nonconstitutional claim will no more change its essential character than calling a bull a cow will change its gender." *State* v. *Gooch,* 186 Conn. 17, 18, 438 A.2d 867 (1982). The constitutional right of a defendant to testify does not permit him to give testimony in disregard of the rules of evidence. Nor does it entitle him to appellate review of a claimed erroneous ruling without compliance with the procedures established for preserving such a claim. We decline, therefore, to review this claim of error because of the failure of the defendant to raise his present claim in the trial court and to take exception to the ruling as required by Practice Book § 288. See Practice Book § 3063.

V

The defendant claims that the court erred in excluding the testimony of an experienced criminal attorney as an expert witness upon the subject of the factors which had induced the state to enter a plea bargain with Benner in respect to charges arising out of the burglary of a home in Prospect. It had been brought out that, before Benner would sign the statement implicating

the defendant in the Woodbury burglary, the state had agreed to reduce the original charge of burglary in the third degree arising out of Benner's break into the Prospect home to second degree criminal trespass with a sentence of six months suspended after thirty days and probation for one year. The expert witness had no actual knowledge of this plea bargain but would have testified, in response to a hypothetical question giving the circumstances of the Prospect crime, that the state was seeking Benner's cooperation in order to convict the defendant in the present case and that the prime reason for the reduction in the charge was to obtain Benner's statement against the defendant.

We agree with the state that the trial court exercised its discretion wisely in excluding this testimony. The inferences which the defendant attempted to elicit from the attorney are so obvious that they could as readily be drawn by the jury and as well articulated by the defendant's counsel in his summation. Although the witness may have been an experienced criminal lawyer, the proffered testimony was merely a superfluous attempt to put the gloss of expertise, like a bit of frosting, upon inferences which lay persons were equally capable of drawing from the evidence. It is only when an expert witness has a special skill or knowledge, beyond the ken of the average juror, on the particular subject at issue that his testimony can be helpful and, accordingly, should be admitted. *Siladi* v. *McNamara,* 164 Conn. 510, 513, 325 A.2d 277 (1973). The testimony of the defendant's expert witness which the court excluded did not qualify under this standard.

## VI

The final claim of error is that the court refused to grant one of the defendant's requests to charge which related to the credibility of Eileen Snyder, who had identified the defendant as the person who delivered

the Hummels stolen from the Woodbury residence to her. The requested instruction sought special consideration of her interest and motivation, her memory of the two occasions when, according to her testimony, she had met the defendant, her statements to other witnesses, her identification of the defendant, and other aspects of her testimony.

The court gave the jury a general charge upon the credibility of witnesses, mentioning particularly their interest in the outcome of the trial, their ability to remember what they had observed, and the significance of any inaccuracies in their testimony. The court commented in particular upon the credibility of Benner as an accomplice, of the police officers and of the defendant. No specific reference was made, however, to the testimony of Eileen Snyder.

The defendant relies upon our statement in *State* v. *Ferrara,* 176 Conn. 508, 512, 408 A.2d 265 (1979), that " '[i]t is well settled law that "[t]he fact that the witness is a defendant in a criminal prosecution, or is a participant in the offense or in a related offense, creates an interest which affects his credibility." ' " He also cites *State* v. *Cooper,* 182 Conn. 207, 212 n.5, 438 A.2d 413 (1980), which declares that "the defendant is entitled to such an instruction [upon the credibility of a witness in the light of any motive for testifying falsely and inculpating the accused] only where it is requested with regard to a complaining witness who could himself be subject to prosecution depending upon the veracity of his version of the particular criminal transaction involved."

The statement in *Cooper* is inapplicable because Snyder plainly was not a complaining witness. The court expressly limited the applicability of *Cooper:* "We do not suggest that, under our holding, a criminal defendant would be entitled to an instruction singling

out any witness who testifies for the state and highlighting his possible motive for falsifying his testimony." Id.

The principle in *Ferrara* which the defendant relies upon was not intended to go beyond the holding of the case that, "where warranted by the evidence, it is the court's *duty* to caution the jury as to the testimony of an accomplice in its charge." *State* v. *Ferrara,* supra, 511. It is, of course, fundamentally inconsistent with the defendant's claim that he never knew Snyder before trial for him to seek a charge upon credibility predicated upon her status as his accomplice. The only evidence of her criminal involvement was contained in the written statement of Benner that the defendant had told him she was a "fence" for Hummels. The defendant, not surprisingly, repudiated the statement attributed to him by declaring that he never knew Snyder before trial. Even if the statement were true, it would not have established Snyder's complicity in the crimes charged against the defendant. There is no evidence that she was in any respect an accomplice in his crimes of conspiracy to commit larceny and to commit burglary.

A portion of the defendant's request, which the court did not include in the charge, related to Eileen Snyder's identification of the defendant. Although we have indicated that a court should grant a request for a charge regarding the dangers of misidentification in an appropriate case, we have not found reversible error in the failure to do so where "the conviction of the defendant did not turn upon the testimony of eyewitnesses who were uncertain, unclear or inconsistent." *State* v. *Harden,* 175 Conn. 315, 322, 398 A.2d 1169 (1978); see *State* v. *Maturo,* 188 Conn. 591, 600, 452 A.2d 642 (1982); *State* v. *Tinsley,* 181 Conn. 388, 393–94, 435 A.2d 1002 (1980), cert. denied, 449 U.S. 1086, 101 S. Ct. 845, 66 L. Ed. 2d 811 (1981). This case does not

present the typical problem of identification arising from a single brief encounter affording minimal opportunity for observation or involving highly suggestive circumstances. The defendant made no motion to suppress the testimony of Eileen Snyder upon those grounds nor would such a motion have had any likelihood of success. Snyder testified that the defendant, using the name Jack Stolfi, contacted her in connection with the sale of some Hummels on two occasions, about one or two years apart. She unhesitatingly selected the defendant's photo from a group of fourteen photographs which were never challenged as unduly suggestive. She also identified him in the courtroom. Furthermore, it was Benner's statement to the police concerning the defendant's remark to him about Eileen Snyder as a fence which led the police to the discovery of the stolen Hummels in her possession. As there is no indication of any contact between Snyder and Benner, the identity of the defendant as the purveyor of the stolen Hummels was confirmed by two independent sources. Under these circumstances, therefore, it was not essential for the trial court to give the requested instruction.

There is no error.

In this opinion the other judges concurred.