******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

BARBARA J. TIPLADY, ADMINISTRATRIX
(ESTATE OF LINDA JABLONSKI) *v.*
SAMUEL MARYLES ET AL.
(AC 35832)

Gruendel, Prescott and Harper, Js.

*Argued January 15—officially released July 28, 2015*

(Appeal from Superior Court, judicial district of
Stamford-Norwalk, Hon. Kevin Tierney, judge trial
referee [motion to strike]; Genuario, J. [judgment])

*Angelo A. Ziotas*, with whom were *Peter M. Dreyer*
and *Michael P. Roffe*, for the appellant (plaintiff).

*John B. Farley*, with whom were *Frederick J. Trotta,
Sr.*, and, on the brief, *Hugh D. Hughes*, for the appellees
(named defendant et al.).

*Eric J. Stockman*, with whom, on the brief, was
*Simon I. Allentuch*, for the appellee (defendant Stam-
ford Health System, Inc.).

*Jennifer L. Cox* and *Jennifer A. Osowiecki* field a brief for the Connecticut Hospital Association as amicus curiae.

*Opinion*

GRUENDEL, J. In this medical malpractice action, the plaintiff, Barbara J. Tiplady, administratrix of the estate of Linda Jablonski, appeals from the judgment of the trial court denying her motion to set aside the jury verdict returned in favor of the defendants, Samuel Maryles, Stamford Health Systems Inc. (Stamford Hospital), Emergency Medicine Physicians of Fairfield County, LLC, and Emergency Medicine Physicians Limited.[1] On appeal, the plaintiff claims that the court abused its discretion when it permitted Maryles, the treating physician, to testify to expert opinions without a proper foundation and then denied the plaintiff an opportunity to cross-examine him on issues raised by the elicited testimony.[2] Specifically, the plaintiff argues that the court improperly admitted expert testimony, under the open door doctrine, that went beyond the scope of earlier opinion testimony elicited by the plaintiff, and later improperly denied the plaintiff an opportunity to challenge Maryles' qualifications on cross-examination. We agree and conclude that, under the facts of this case, the court abused its discretion when it admitted the challenged testimony, and that the error was harmful. Accordingly, we reverse the judgment of the trial court.

The following facts and procedural history reasonably could have been found at trial. On November 15, 2004, Jablonski presented to the emergency department at Stamford Hospital complaining of headaches and nausea. Jablonski first was examined by a triage nurse, who reported that she had experienced headaches for the past four or five days and had been "vomiting since last week." Jablonski then was examined and treated by Maryles, a physician specializing in emergency medicine. Maryles reported that Jablonski was "a [forty-two] year old female who presents complaining of vomiting for the last couple of days on and off associated with atypical migraine type headache for her that started today." His report also noted that Jablonski had a history of migraines and had previously been prescribed Imitrex, a drug used to treat migraine headaches. Maryles then performed a medical evaluation of Jablonski.

At 7:10 p.m., Maryles began treatment of Jablonski by providing her with intravenous saline fluid, Pepsid, and Reglan. The purpose of the saline fluid was to address the loss in fluids, resulting from the Jablonski's vomiting. Pepsid, an antacid, was given to address her nausea. Reglan was provided to treat her headache pain. At 8 p.m., a nurse evaluated Jablonski, who stated that her headache persisted, describing the pain as an eight on a ten point scale. Maryles then prescribed Toradol, an anti-inflammatory medication, to address Jablonski's headache. At 8:56 p.m., with the headache continuing to persist, Maryles prescribed Vicodin, which was effective in reducing the pain. At 9:56 p.m., Jablonski's condi-

tion had improved and she was discharged from the emergency room. Maryles reported a final diagnosis of hepatitis and migraine headache. He requested lab tests regarding the possibility of hepatitis and instructed Jablonski to follow up with her physician in the next two or three days.

The following day, Jablonski was taken by the police to Bridgeport Hospital after she was found driving in the wrong direction on a highway exit ramp. When the police found her, she was confused and disoriented. Doctors at Bridgeport Hospital determined that she was suffering from herpes simplex encephalitis, a viral infection of the brain that causes swelling that can result in coma or death. Common symptoms of the infection are headache, fever, weakness on one side of the body, aphasia, nausea, and vomiting; however, not all symptoms are present in every patient. The viral infection tends to run its course between three days and a week from the initial presentation of symptoms. The medical professionals at Bridgeport Hospital, upon reaching their diagnosis, treated Jablonski with a drug called Acyclovir. She failed to respond to treatment and succumbed to the disease several days later. An autopsy later confirmed the cause of death as herpes simplex encephalitis.

After Jablonski's death, the plaintiff, her mother, filed the present medical malpractice action, in her capacity as administratrix of the estate of her daughter, against the defendants and Stamford Hospital. The plaintiff's complaint alleged that Maryles and Stamford Hospital personnel negligently failed to diagnose and treat Jablonski's condition. The complaint further alleged that the failure to diagnose and treat her condition ultimately led to her death.

Prior to trial, the defendants filed a motion in limine, seeking to preclude from evidence a consent agreement and order entered into by Maryles with the New York Department of Health, as well as evidence that Maryles twice previously had failed the emergency medicine board examination. The consent agreement and order related to a 2007 investigation by the New York State Department of Health's Office of Professional Medical Conduct (department). As a result of that investigation, the department brought seven counts of professional misconduct against Maryles, including "[failure] to maintain a record for each patient [that] accurately reflects the care and treatment of the patient" and "practicing medicine with negligence on more than one occasion." The court granted the motion in limine on the ground that the evidence was more prejudicial than probative.[3] At the same time, the court clarified that the order was preliminary and that the evidence could become admissible if the defendants offered evidence regarding Maryles' qualifications or habit. In reaching that ruling, the court emphasized that Maryles had not

been offered by either party as an expert witness.

During her case-in-chief, the plaintiff called Maryles to testify. The plaintiff did not disclose Maryles as an expert witness, nor was a foundation laid establishing his credentials. Notwithstanding this, the plaintiff asked a question that elicited medical opinion, which was answered without objection. The plaintiff asked Maryles, "[y]ou and I are in agreement then, an atypical migraine headache needed to be worked up with a CAT scan and a lumbar puncture. Right?" Maryles agreed that this was the appropriate treatment for an atypical headache. The plaintiff's counsel then stated: "Now, I'm not asking you that as an expert. I'm asking you as a party." At the conclusion of the plaintiff's direct examination, the defendants stated that they would reserve their cross-examination questions for their case-in-chief.

On September 19, 2012, the defendants called Maryles to testify. The defendants' counsel began with a series of questions related to his professional background. Maryles was asked where he went to high school and college; he was asked if he graduated from college and the types of courses that were included in his "pre-med studies." The defendants' counsel started to ask the following question before he was interrupted by the court: "And then following your graduation from [your undergraduate university], sir . . . ." The court interrupted the examination and excused the jury from the courtroom. The court then explained that, "I was clear that if you put the doctor's credentials in issue that the plaintiff would then be able to cross-examine more thoroughly. The only conclusion that I could draw [from the defendants' counsel's questioning] was that you were confused as to my ruling. I want everybody to be clear what my ruling was. And that if you put the doctor's credentials at issue, then I'm going to allow the consent decree to come in." The court later stated: "Maybe you weren't going any further, but you were going down a road which in my opinion would have resulted in me having to let in evidence that I have already indicated more times than I want to that I think is prejudicial and not particularly probative but the plaintiff would have that right." The court then ruled that the defendants' counsel had not opened the door to allow evidence of Maryles' New York consent decree.

Before proceeding, the court provided the plaintiff's counsel with an opportunity to be heard. The plaintiff's counsel replied with the following: "[The defendants' counsel] was starting to elicit a clear list of qualifications and credentials that would have allowed Your Honor to do what I believe is fair and right. I'm sitting here with my head down, [my cocounsel] is writing notes trying to keep . . . Your Honor from doing what you just did. You injected yourself as cocounsel for the defense. There's no ambiguity. . . . We were talking

about something that you were, absolutely, one hundred percent clear on. . . . So for this court to pull us up to sidebar when this witness is in the middle of allowing the plaintiff to get a fair trial, I object." The plaintiff's counsel then moved to strike the prior testimony and the court denied the motion on the basis that the questions only covered Maryles' high school and college education and "it is common knowledge that doctors need to go to college [and] need to go to high school."

The jury returned and the defendants' direct examination of Maryles continued. During the examination, the defendants' counsel asked several questions that elicited medical opinion testimony. Although the plaintiff's counsel objected on the basis that Maryles had not been offered as an expert, the court overruled those objections on the ground that the plaintiff's counsel had opened the door when he elicited medical opinion testimony during the plaintiff's case-in-chief. Maryles was asked by the defendants' counsel, over the plaintiff's objection, whether it was important, when he is assessing someone with a headache complaint, to observe: (1) whether the head is normal-cephalic and atraumatic, (2) the extraoccular eye movements, (3) the cranial nerves, and (4) whether the patient's eyes are closed. Maryles answered affirmatively, stating that it was important to consider each of the observations. He then explained why each assessment was important in properly diagnosing a patient who presents with a headache.

The defendants' counsel then asked Maryles other questions eliciting expert opinions. Counsel asked: "When a patient complains of an atypical, all one word, headache, are there things that are done to manage that complaint." Maryles testified that "after doing a proper physical examination, you generally do some blood tests, and then potentially a CAT scan and a lumbar puncture." The defendants' counsel then asked: "What are the things you are alert for when a patient complains of [an] atypical headache?" After the court overruled an objection from the plaintiff's counsel, Maryles stated that "[a] patient . . . with an atypical headache is at risk for things like infection of the brain as well as bleeding, as well as things like tumors and masses." Maryles then was asked what the proper method was for treating a patient with a typical headache. Maryles testified that he would review the patient's history, "making sure that this is their usual headache; that this is not different than the headache they normally have . . . ." Finally, the defendants' counsel asked about a notation from the medical report from Jablonski's admission to the Stamford Hospital emergency room. The notation stated that she suffered from "atypical" headache. Maryles responded that it was his belief that the notation was the result of a typographical error, and should be read as "a typical" headache.

At the conclusion of trial, the jury returned a verdict in favor of the defendants. Through its responses to interrogatories, the jury found that the plaintiff had failed to prove that Maryles had deviated from the standard of care.[4]

Following the jury verdict, the plaintiff filed a motion to set aside the verdict and for a new trial. On June 12, 2013, in its memorandum of decision, the court denied both motions, and the plaintiff appealed.

I

The plaintiff claims that the court abused its discretion when it improperly allowed the defendants to elicit expert testimony from Maryles. At trial, the court ruled that, although he had not been offered as an expert, Maryles had provided expert opinion testimony under the plaintiff's examination and that, under the open the door doctrine, it would allow the defendants to elicit similar testimony within the same scope. The plaintiff argues that Maryles' subsequent testimony under the defendants' direct examination went beyond the scope of the initial offer, and thus the admission of such testimony was an abuse of the court's discretion. Additionally, the plaintiff argues that the court further compounded this error when it precluded the plaintiff from an opportunity to fully cross-examine Maryles regarding his credentials. We agree.

We begin by setting forth the applicable standard of review. "It is well established that [t]he trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion." (Internal quotation marks omitted.) *Prentice* v. *Dalco Electric, Inc.*, 280 Conn. 336, 342, 907 A.2d 1204 (2006), cert. denied, 549 U.S. 1266, 127 S. Ct. 1494, 167 L. Ed. 2d 230 (2007). "[E]ven when a trial court's evidentiary ruling is deemed to be improper . . . we [still] must determine whether that ruling was so harmful as to require a new trial. . . . In other words, an evidentiary ruling will result in a new trial only if the ruling was both wrong and harmful. . . . [T]he standard in a civil case for determining whether an improper ruling was harmful is whether the . . . ruling [likely] would [have] affect[ed] the result." (Emphasis omitted; internal quotation marks omitted.) Id., 358. In assessing harm, we consider whether the "erroneously admitted evidence . . . [may have] affected the jury's perception of the remaining evidence." *Swenson* v. *Sawoska*, 215 Conn. 148, 153, 575 A.2d 206 (1990). We now consider each of the plaintiff's claims of evidentiary impropriety and then consider whether the resulting error was harmful.

A

Expert testimony is admissible if (1) the witness is qualified as an expert and (2) the testimony assists the trier of fact in understanding the evidence or determin-

ing a fact at issue. See Conn. Code Evid. § 7-2, commentary. An expert's testimony is admissible only when the witness has "special skill or knowledge, beyond the ken of the average juror, on the particular subject at issue . . . ." *State* v. *George*, 194 Conn. 361, 373, 481 A.2d 1068 (1984), cert. denied, 469 U.S. 1191, 105 S. Ct. 963, 83 L. Ed. 2d 968 (1985). The sufficiency of the expert's qualifications is a preliminary question for the court. *Blanchard* v. *Bridgeport*, 190 Conn. 798, 808, 463 A.2d 553 (1983). Before expert testimony may be admitted, the court must determine whether the scope of the expert's knowledge and experience qualifies him to render an expert opinion. See *Oborski* v. *New Haven Gas Co.*, 151 Conn. 274, 280, 197 A.2d 73 (1964).

Although evidence may be otherwise inadmissible, "a party who delves into a particular subject during the examination of a witness cannot object if the opposing party later questions the witness on the same subject. . . . The party who initiates discussion on the issue is said to have 'opened the door' to rebuttal by the opposing party. Even though the rebuttal evidence would ordinarily be inadmissible on other grounds, the court may, in its discretion, allow it where the party initiating inquiry has made unfair use of the evidence." (Citations omitted.) *State* v. *Graham*, 200 Conn. 9, 13, 509 A.2d 493 (1986). The purpose of this doctrine is to "prevent a [party] from successfully excluding inadmissible . . . evidence and then selectively introducing pieces of this evidence for his own advantage, without allowing [the opposing party] to place the evidence in its proper context." (Internal quotation marks omitted.) Id.

Under the open the door doctrine, a court must "consider whether the circumstances of the case warrant further inquiry into the subject matter, and should permit [the evidence] . . . to the extent necessary to remove any unfair prejudice which might otherwise have ensued from the original evidence." (Internal quotation marks omitted.) *Somers* v. *LeVasseur*, 230 Conn. 560, 566, 645 A.2d 993 (1994). Stated differently, the opposing party is allowed to place the initial evidence in its proper context. See *State* v. *Glenn*, 194 Conn. 483, 498–99, 481 A.2d 741 (1984). "Such a decision, of course, rests within the discretion of the trial court." *Somers* v. *LeVasseur*, supra, 566.

In the present case, the plaintiff's direct examination of Maryles elicited expert testimony regarding the standard of care for a patient complaining of an atypical headache. Thus, under the open the door doctrine, it would have been proper to allow the defendants' counsel to elicit testimony regarding the appropriate standard of care. As the presentation of Jablonski's headache was a key issue at trial, it would have been appropriate for Maryles to clarify that although an atypical headache required a CAT scan and a lumbar puncture, a traditional migraine headache did not. It also

would have been appropriate for Maryles to testify to the standard of care for a patient complaining of a typical migraine headache.

Our review of the transcript reveals that the defendants' examination of Maryles was not limited to the extent necessary to place his earlier testimony in context. Over the plaintiff's objection, the defendants' counsel solicited, and Maryles offered, medical opinions that went beyond the standard of care issues raised by the plaintiff.[5]

The following examples highlight the ways in which Maryles offered medical opinion testimony. He testified regarding the various ailments that he is "alert for when a person complains of an atypical headache." He stated that "a patient . . . with an atypical headache is at risk for things like infections of the brain as well as bleeding, as well as things like tumors and masses. So, the workup is to essentially rule out those possibilities." Maryles further explained the importance of several assessments that are performed during the treatment of a headache. These assessments included determining whether the patient's head was normal-cephalic and atraumatic. To this point, Maryles stated that "then you would know whether they'd suffered any trauma and . . . whether their head was of normal shape." He explained why it was critical to assess the patient's extraoccular eye movement, stating: "If their extraoccular movements are intact then you know that they're not suffering any cranial nerve abnormalities." Additionally, he testified that it was important to assess the patient's cranial nerves, stating: "If the cranial nerves are intact, they're less likely to have an issue going on which would affect them, such as inflammation or mass." Lastly, Maryles stated that it was important to assess whether the patient had photophobia, because "certain maladies such as migraines can be worsened by lights." All of these opinions went beyond the scope of testimony elicited by the plaintiff and required Maryles to rely on his professional experience and expertise.

Moreover, Maryles' expert testimony went beyond the issue of the standard of care raised by the plaintiff, namely, what an emergency room physician is required to do under the circumstances. Specifically, the testimony extended to *what Maryles does* and looks for when treating a patient with headaches. Standard of care in the medical malpractice context is defined as the "degree of skill and learning commonly applied under . . . the circumstances in the community by the average prudent reputable member of the profession . . . ." (Internal quotation marks omitted.) *Gold* v. *Greenwich Hospital Assn.*, 262 Conn. 248, 254, 811 A.2d 1266 (2002). Breach in a medical malpractice case is defined as a deviation from the professional standard. Id. Maryles was asked by the defendants' counsel: "What are the things *you* are alert for when a patient

complains of an atypical headache?" He later was asked: "And Doctor, the same question with regard to a patient complaining of a space typical headache." Maryles' responses did not explain the appropriate standard of the profession, but rather explained what his particular knowledge, understanding, and practice is when treating patients with headaches. *Trimel* v. *Lawrence & Memorial Hospital Rehabilitation Center*, 61 Conn. App. 353, 358, 764 A.2d 203 (medical malpractice presupposes "the failure to exercise [the] requisite medical skill" [internal quotation marks omitted]), appeal dismissed, 258 Conn. 711, 784 A.2d 889 (2001). Maryles' testimony regarding the importance of each step of his treatment, as well as his knowledge of the potential underlying causes of a headache, support the defendants' position that Maryles had not deviated from the standard of care because he knew how to properly treat both typical and atypical headaches.

In concluding that the defendants' direct examination of Maryles elicited testimony that exceeded the scope of the plaintiff's examination, we follow the established principle that "[t]he doctrine of opening the door cannot, of course, be subverted into a rule for injection of prejudice. . . . The trial court must carefully consider whether the circumstances of the case warrant further inquiry into the subject matter, and *should permit it only to the extent necessary to remove any unfair prejudice which might otherwise have ensued from the original evidence.*" (Citations omitted; emphasis added; internal quotation marks omitted.) *State* v. *Graham*, supra, 200 Conn. 13–14. When the defendants' counsel elicited Maryles' opinions beyond the scope of the plaintiff's initial offer, the plaintiff objected and the objection was overruled. In overruling the objection, the court permitted the defendants to present expert testimony without first laying a foundation regarding the scope of Maryles' expertise. A party who wishes to offer expert testimony must disclose the expert prior to trial and establish their qualifications and skill through foundational evidence. See Practice Book § 13-4 (requiring disclosure of each person who may testify as expert at trial); *Weaver* v. *McKnight*, 313 Conn. 393, 405–406, 97 A.3d 920 (2014) (offering party must establish expert has special skill or knowledge directly applicable to matter that would be helpful to jury in considering issues). Maryles' testimony was therefore not admissible as expert testimony and, alternatively, was not admissible under the open the door doctrine. Accordingly, we conclude that the court abused its discretion in admitting the testimony.

### B

The plaintiff next claims that the court abused its discretion when it barred cross-examination of Maryles' credentials. We agree.

The court's impropriety regarding the extent to which

it permitted the defendants' counsel to elicit extensive opinion testimony was compounded when it precluded the plaintiff's counsel from challenging Maryles' qualifications and experience on cross-examination. On cross-examination, the plaintiff's counsel attempted to ask Maryles "in your prior job, you were not let go under good circumstances, were you?" The defendants' counsel objected and the court sustained the objection. After excusing the jury, the court heard argument from both sides. The plaintiff's counsel asserted that he should be permitted to ask Maryles' questions that challenged his credibility as a witness. The defendants' counsel argued that the motion in limine regarding the doctor's consent agreement precluded such questions. The court sustained the objection, stating: "I do not want any further questions in front of the jury that are designed to elicit either the consent decree or the circumstances underlying the consent decree."[6]

It is well established that "[c]ross-examination is an indispensable means of eliciting facts that may raise questions about the credibility of witnesses and, as a substantial legal right, it may not be abrogated or abridged at the discretion of the court to the prejudice of the party conducting that cross-examination." *Hayes* v. *Manchester Memorial Hospital*, 38 Conn. App. 471, 474, 661 A.2d 123, cert. denied, 235 Conn. 922, 666 A.2d 1185 (1995). "One of the proper purposes of cross-examination of an expert is to test the expert's qualifications and credibility . . . ." *Richmond* v. *Longo*, 27 Conn. App. 30, 38, 604 A.2d 374, cert. denied, 222 Conn. 902, 606 A.2d 1328 (1992). "[Q]uestions regarding the expert's skill and qualifications go to the expert's credibility." Id.

As Maryles' testimony constituted expert opinion, his testimony, in response to the defendants' counsel's direct examination, placed Maryles' qualifications and experience at issue, and the plaintiff should have been permitted an opportunity to challenge his testimony during cross-examination. In other words, the door must swing open in both directions. Accordingly, we conclude that the court also abused its discretion when it denied the plaintiff an opportunity to cross-examine Maryles regarding his qualifications.

### C

We now consider whether these improprieties constitute reversible error. At closing argument, the defendants' counsel used Maryles' opinion testimony as the basis for his defense against the claim that he had deviated from the standard of care. The defendants' counsel argued: "Maryles did testify what he would do if a headache was atypical, offered by the plaintiff's that very first day. Atypical: Well, you do a lumbar puncture and a CT scan. You had the chance to see Dr. Maryles. You've assessed that man. You heard him speak. You saw him on the stand under very hostile circumstances.

He stands straight up, ladies and gentlemen. He does not dodge. *He tells you exactly how he feels he treats patients. And if it's a typical with a response to medication the patient doesn't get a CT and a lumbar. If it's atypical, she does.*" (Emphasis added.) The essence of this argument was that Maryles had not deviated from the standard of care because he understood how to properly treat a patient with a headache. On this basis, the defendants implored the jury to conclude that Jablonski did not present with atypical headaches on the day in question because, if she had, Maryles would have properly diagnosed and treated it. This argument relied on the credibility of Maryles' opinion testimony. He had testified that he knew the appropriate standard of care for patients with typical headaches, as well as the standard of care for patients with atypical headaches. He had testified that he knew the various medical conditions that can cause a headache. He had also testified about each assessment that was performed and explained its importance in diagnosing the patient. This testimony was not merely cumulative of other evidence presented in this case. See *Swenson* v. *Sawoska*, supra, 215 Conn. 155 (erroneously admitted evidence, if cumulative of other evidence, does not constitute harmful error). As Maryles' expert testimony formed the basis of the defendants' defense to the claim that Maryles committed medical malpractice, we conclude that the improper admission of that testimony was harmful.[7]

Moreover, Maryles' expert testimony likely affected the jury's evaluation of the remaining evidence presented at trial, specifically the medical report from Jablonski's admission to the Stamford Hospital emergency room. The medical report served as the only evidence of Jablonski's condition in the emergency room, as well as the medical treatment she received. At trial, the plaintiff argued that the "atypical headache" notation was probative evidence that Maryles had breached the standard of care when he failed to perform a CAT scan and a lumbar puncture. The defendants argued that the notation was a typographical error. As Maryles had dictated the contents of that medical report, his expert testimony, without a full cross-examination, colored the jury's perception on this critical issue of fact. If the jury determined that Maryles was credible, then it would be more likely to credit his explanation that the notation was a typographical error. If, on the other hand, the jury determined that Maryles was not credible, then it would be more likely to conclude that, faced with a patient with an atypical headache, Maryles had deviated from the standard of care by not performing a CAT scan and lumbar puncture. Thus, we conclude that the improper admission of Maryles' expert testimony that was beyond the scope of the testimony originally elicited by the plaintiff, and the court's subsequent denial of proper cross-examination regarding Maryles' qualifications, likely affected the

result of the trial and, therefore, constituted harmful error. Accordingly, the case must be remanded for a new trial.

## II

### A

Because we concluded that the case is to be remanded for a new trial, it is appropriate for us to address certain issues, raised by the plaintiff, that are likely to recur on retrial. See *Sullivan* v. *Metro-North Commuter Railroad Co.*, 292 Conn. 150, 164, 971 A.2d 676 (2009). First, the plaintiff claims that the trial court erred in deciding, as a matter of law, that Stamford Hospital could not be liable for the torts of its apparent agents. We decline, however, to reach the merits of this claim for the reasons we set forth.

The following relevant procedural history can be found in the court's memorandum of decision on the plaintiff's motions to set aside the verdict and for a new trial. "By way of background, in count three of the revised complaint dated May 28, 2012, the plaintiff alleged that Dr. Maryles was acting as the actual or apparent agent of Stamford Hospital. It is undisputed that Dr. Maryles was the employee of the defendant Emergency Medicine Physicians of Fairfield County, LLC (EMP). It was also undisputed that Stamford Hospital contracted with EMP to provide emergency department physicians at Stamford Hospital. The parties had previously filed cross motions for summary judgment on the issue of apparent agency but agreed to reserve the issue of apparent agency for the trial judge." Prior to the start of evidence, the court granted Stamford Hospital's motion in limine to preclude evidence concerning apparent agency. "Since apparent agency deals with vicarious liability and a jury found that the defendant Dr. Maryles was not liable to the plaintiff, the issue of apparent agency has become moot in the case at bar . . . . Nonetheless, because of the importance of the issue . . . this court needs to set forth its ruling and rationale." The court then analyzed the case law and ruled "based upon *L & V Contractors*, [*LLC* v. *Heritage Warranty Ins. Risk Retention Group, Inc.*, 136 Conn. App. 662, 669–70, 47 A.3d 887 (2012)] the doctrine of apparent agency would not be available to the plaintiff in this case in her effort to hold the Stamford Hospital liable for alleged tortious conduct of the defendant Dr. Maryles."[8]

"Mootness implicates a court's subject matter jurisdiction . . . . [I]t is required, among other things, that there be an actual controversy between or among the parties . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *T.D.*, 286 Conn. 353, 361, 944 A.2d 288 (2008). "If the trial court issues a decision on the merits of a case over which it lacks subject matter jurisdiction, the decision constitutes an advisory opin-

ion. . . . Such an opinion is not a judgment and is not binding on anyone." (Citations omitted; internal quotation marks omitted.) *PHH Mortgage Corp.* v. *Cameron*, 130 Conn. App. 238, 242, 22 A.3d 1282 (2011). In the present case, the jury's verdict barred the vicarious liability claim against Stamford Hospital. Thus, the court's analysis of the application of apparent authority constituted an advisory opinion and is not reviewable on appeal because the underlying issue is moot. Accordingly, we do not reach the merits of this claim.

B

The plaintiff also claims that the court erred when it struck certain paragraphs of her complaint alleging that Stamford Hospital had a nondelegable duty to the patients who are treated in its emergency room. The plaintiff argues that certain regulations impose a duty on hospitals to provide adequate emergency room care to patients and that this duty is nondelegable. Stamford Hospital argues that Connecticut has never recognized such a claim. We agree with Stamford Hospital.

The following procedural history is relevant to our resolution of the plaintiff's claim. Prior to trial, Stamford Hospital filed a motion to strike paragraphs 15, 16, and 17 of the plaintiff's complaint on the basis that the paragraphs alleged an unrecognized nondelegable duty and therefore failed to state a cause of action.[9] On June 25, 2010, the court, *Hon. Kevin Tierney*, judge trial referee, granted the motion on the basis that the state "does not recognize a claim based on nondelegable duty against a Connecticut hospital for the negligence of physicians employed by another nonhospital entity as emergency room physicians staffing that hospital's emergency room."

"The standard of review in an appeal challenging a trial court's granting of a motion to strike is well established. A motion to strike challenges the legal sufficiency of a pleading, and, consequently, requires no factual findings by the trial court. As a result, our review of the court's ruling is plenary. . . . We take the facts to be those alleged in the [pleading] that has been stricken and we construe the [pleading] in the manner most favorable to sustaining its legal sufficiency." (Internal quotation marks omitted.) *Himmelstein* v. *Windsor*, 116 Conn. App. 28, 33, 974 A.2d 820 (2009), aff'd, 304 Conn. 298, 39 A.3d 1065 (2012).

"It is well established that, [u]nder the general rule, an employer is not liable for the negligence of its independent contractors. . . . One exception to this general rule, however, is [when] the owner or occupier of premises owes invitees a nondelegable duty to exercise ordinary care for the safety of such persons. . . . Nondelegable duties generally are imposed, most often by statute, contract or common law, in recognition of the policy judgment that certain obligations are of such

importance that employers should not be able to escape liability merely by hiring others to perform them. . . . In such circumstances, the nondelegable duty doctrine means that [the employer] may contract out the performance of [its] nondelegable duty, but may not contract out [its] ultimate legal responsibility. . . . Thus, the nondelegable duty doctrine creates a form of vicarious liability, whereby the employer remains vicariously liable for the negligence of its independent contractors in their performance of the employer's nondelegable duty." (Citations omitted; emphasis omitted; internal quotation marks omitted.) *Machado* v. *Hartford*, 292 Conn. 364, 371–72, 972 A.2d 724 (2009).

In arguing the existence of a nondelegable duty in the present case, the plaintiff relies on two regulations, one state and one federal, that require hospitals to provide emergency care to the public. The state regulation; Regs. Conn. State Agencies § 19-13-D3 (j) (2); requires that "[e]ach general hospital shall be organized in such a way as to provide adequate care for persons with acute emergencies at all hours." The plaintiff argues that this requirement establishes a hospital's nondelegable duty for malpractice by independent physicians working in its emergency room. We are not persuaded. Subsection (j) (3) of § 19-13-D3 states that "[i]n a city or town with two or more hospitals, the operation by one such hospital, under a mutual agreement, acceptable to the Connecticut Department of Health, of an emergency room twenty-four hours a day shall be considered satisfactory compliance with this section . . . ." Subsections (j) (2) and (j) (3) of § 19-13-D3, when read in context, state clearly that one hospital can contract its duty to provide emergency room care. Thus, Stamford Hospital's duty is delegable and the regulation does not support the plaintiff's claim.[10]

The federal regulation cited by the plaintiff, 42 C.F.R. § 482.12, requires that hospitals maintain a governing body that is legally responsible for the conduct of the hospital. Subsection (e) of § 482.12 states that the governing body "must be responsible for services furnished in the hospital whether or not they are furnished under contracts. . . . (1) The governing body must ensure that services performed under a contract are provided in a safe and effective manner." The plaintiff urges us to construe this regulation as imposing a duty on Stamford Hospital to ensure that independently contracted physicians do not conduct malpractice while treating patients in its emergency room. We disagree.

First, the purpose of 42 C.F.R. § 482 is to "serve as a basis of survey activities for the purpose of determining whether a hospital qualifies for a provider agreement under Medicare and Medicaid." 42 C.F.R. § 482.1 (b). Given this stated purpose, it is unclear how the federal regulation supports the plaintiff's proposition.

Second, the plaintiff concedes that Connecticut has

not previously recognized a nondelegable duty in the context of a hospital and an independent contractor physician. Neither of the regulations relied upon by the plaintiff creates such a duty under these facts, and the plaintiff has directed us to no other statutory or common-law authority imposing such a duty on a hospital. Our review of the applicable case law also revealed no such recognized species of liability. Accordingly, the court properly struck the paragraphs alleging that Stamford Hospital had a nondelegable duty to Jablonski.

We have reviewed the remainder of the plaintiff's claims of error and do not consider them likely to arise on retrial. *State* v. *Jones*, 234 Conn. 324, 351, 662 A.2d 1199 (1995). The error already found in the judgment make it unnecessary for us to identify and discuss these claims further.

The judgment is reversed and the case is remanded for a new trial.

In this opinion the other judges concurred.

[1] In this opinion, we refer to Maryles and his employers, Emergency Medicine Physicians of Fairfield County, LLC, and Emergency Medicine Physicians Limited, collectively as the defendants. We refer to Stamford Hospital as such.

[2] The plaintiff also claims that the court improperly: (1) instructed the jury to consider Maryles' testimony in the same manner as any other expert, (2) denied her request to strike the testimony of the defendants' expert, (3) concluded that Stamford Hospital did not owe a nondelegable duty to its emergency room patients, and (4) concluded, as a matter of law, that Stamford Hospital could not be liable for the torts of its apparent agents. Because we agree with the plaintiff's evidentiary claim, which is dispositive, we do not reach the merits of the plaintiff's first and second additional claims. To the extent necessary, we address the plaintiff's third and fourth claims in part II of this opinion.

[3] We note that the court's decision to grant the motion in limine is not the subject of this appeal.

[4] The jury's interrogatory responses are as follows:

"Interrogatory 1: Did the plaintiff prove by a preponderance of the evidence, the standard of care applicable to [Maryles]? Yes.

"Interrogatory 2: Did the plaintiff prove by a preponderance of the evidence, that [Maryles] deviated from the accepted standard of care as alleged? No."

[5] The plaintiff's counsel made a timely objection to Maryles' expert testimony. When the first question eliciting expert opinion testimony was asked, he said: "Objection, Your Honor. It's beyond the scope now of the initial examination. We're getting into opinions that were not elicited." The court overruled this objection and allowed the testimony.

[6] Prior to making its ruling, the court ordered the plaintiff's counsel to divulge the questions he planned to ask Maryles on cross-examination. With Maryles and the jury outside of the courtroom, but in the presence of opposing counsel, the plaintiff's counsel was required to explain to the court the questions he planned to ask regarding Maryles' credibility, qualifications, and employment status.

[7] Furthermore, the court's charge to the jury did nothing to cure the harm. At the conclusion of trial, the court instructed the jury to evaluate Maryles' testimony using the "same criteria . . . [used] to evaluate the opinions and credibility of the expert witnesses in this matter." The court stated that "expert witnesses are people who have knowledge beyond that of an ordinary person. . . . [And that] [b]ecause of [their] expertise in whatever field they happen to be in, expert witnesses are allowed to give their opinion." This instruction had the reasonable likelihood of misleading the jury because it requested the jury to evaluate Maryles' credibility without any foundational evidence regarding his qualifications. It also had the potential to elevate Maryles' testimony to that of a qualified expert. *State* v. *George*, supra, 194 Conn. 373 (noting danger that "[a] gloss of expertise, like a bit of frosting"

will improperly influence jury's fact finding function).

[8] We note that our Supreme Court, in another case, recently granted certification on this issue. See *Cefaratti* v. *Aranow*, 315 Conn. 919, 107 A.3d 960 (2015).

[9] No party challenges the court's determination that these paragraphs purported to state a distinct cause of action against Stamford Hospital and, therefore, were properly the subject of a motion to strike.

[10] We do not purport to decide whether a hospital in a town or a city that does not have a second hospital has a nondelegable duty to provide adequate care for persons with acute emergencies at all hours.